(5 Misc. Rep. 26.)

PEOPLE ex rel. SMITHER v. RICHMOND et al.

(Supreme Court, Special Term, Erie County. August, 1893.)

1. ELECTION DISTRICTS IN CITIES—DIVIDING WARDS—MANDATORY STATUTE.
    Laws 1892, c. 680, § 8, provides that the common council of every city, except New York and Brooklyn, in which there shall be a ward containing more than 400 voters, "shall," at least 30 days before the election of inspectors of election, divide the ward into election districts

containing not more than 400 voters each; and that a ward containing less than 400 voters "may" be divided into election districts by the common council, for the convenience of voters. *Held*, that the statute is mandatory as to wards containing more than 400 voters, and compliance therewith will be compelled by mandamus.

**2. SAME—PREMATURE APPLICATION.**
An application for mandamus in such case is premature so long as sufficient time remains for the common council to make the division 30 days before the election of inspectors of election.

**3. MANDAMUS—REFUSAL OF CITY COUNCIL TO ACT.**
A resolution of the board of aldermen for the division of certain wards into election districts as required by law was disapproved in part by the board of councilmen, and returned to the board of aldermen, according to the procedure prescribed by the city charter. The board of aldermen then included additional matter in the resolution, and returned it to the board of councilmen, which laid the resolution on the table. *Held*, that the action of the board of councilmen in the matter was not final, so as to authorize mandamus to compel it to act.

Application by Smither for a writ of mandamus to Richmond and others, as members of the board of councilmen of the city of Buffalo. Denied.

Tracy C. Becker, for relator.
Philip A. Laing, for defendants.

HAIGHT, J. On the 10th day of July, 1893, at a regular meeting of the board of aldermen at which a quorum was present, Alderman White, from the special committee on redistricting the wards into election districts, made a report in favor of redistricting the First, Seventeenth, Eighteenth, Twenty-Fourth, and Twenty-Fifth wards of the city of Buffalo. The report contained the number and boundaries of each district into which it was proposed to divide the wards. The report was adopted as to each ward separately, and the proceedings transmitted to the board of councilmen. On the 12th day of July, 1893, at a regular meeting of the board of councilmen, at which a quorum was present, Coakley, Sandrock, and Kreinheder were appointed a committee to investigate the proposed redistricting of the wards as set forth in the proceedings of the board of aldermen; and thereafter, and on the 26th day of July, 1893, at a regular meeting of the board of councilmen, the following report was made by Councilmen Sandrock and Coakley:

"The committee to whom was referred the matter of the action of the board of aldermen in redistricting the wards, taken on the 10th day of July, 1893, respectfully report: We do not deem it advisable to redistrict the wards, as proposed by the board of aldermen, upon the grounds, viz.: That the election districts should not be changed unless there be grave necessity therefor; that such changes confuse and annoy the electors, and result in disfranchising many; that, the electors having chosen the inspectors of election, the common council should do all in its power to conform to the wishes of the electors so expressed; that in elections following a presidential election the vote is materially reduced; and that, while certain districts show an apparent excess, they will undoubtedly be reduced within the numerical limit in the coming election, and with an increase of districts comes an additional expense to the taxpayers, which we desire to avoid. Take the First ward, for instance. The total vote last year was 1,402. It

has four districts. Only one—the first district—exceeds the limit. This district shows an excess of thirty-one. To change the districts of this ward would be doing an injustice to the electors which we cannot approve nor justify. We find a large number of districts which exceed the limit, which are not changed by the board, and this action furnishes additional reason for not laying too much stress upon the limit number. The action of the board in relation to the Twenty-Fifth ward meets with approbation on all sides, and, it being for the interests of the electors, we approve such action. We therefore recommend the adoption of the following resolution: That the action of the board of aldermen in redistricting the wards, except so much thereof as redistricts the Twenty-Fifth ward, be disapproved; that the action of the board of aldermen in redistricting the Twenty-Fifth ward be approved."

Councilman Kreinheder made a minority report, in which he referred to the statute, as making it the duty of the common council to divide the wards into election districts, each of which shall not contain more than 400 voters, and concludes as follows:

"And as the First ward, a year ago, was redistricted for the only purpose to throw out the inspectors of election, in simply reversing the numbers of the districts, and it being only fair to put the same back to what the electors of said ward have had previous to last year, therefore, the undersigned would report in favor of concurring in the redistricting of said ward; the Seventeenth ward being redistricted very evenly, to concur in same; the Eighteenth ward, would report in favor of resolution by Alderman Burgard, as that seems to be the most evenly redistricted; the Twenty-Fourth and Twenty-Fifth wards should by all means be redistricted, as these wards are in the part of the city which has mostly gained in population, and cover a large territory, and therefore makes it inconvenient for a great many electors to vote. Therefore, would report in favor of concurring with the action of the board of aldermen."

The majority report was then adopted. On the 31st day of July, 1893, at a regular meeting of the board of aldermen, a quorum being present, a resolution was offered by Alderman Smither to the effect that the following wards should be redistricted, giving the boundaries of each district as proposed, viz. the First, Seventeenth, Eighteenth, Twentieth, and Twenty-Fourth wards, which resolution was adopted, and the same was transmitted to the board of councilmen; and thereafter, and on the 2d day of August, 1893, at a regular meeting of the board of councilmen, the resolution of Alderman Smither was laid upon the table.

The writ of mandamus issues on the relation of any person who has a clear legal right to have a public act or duty performed by a corporate body or officer. The courts will compel the performance of a ministerial duty, or the executing of the provisions of a mandatory statute, but will not interfere with an officer whose duties are strictly judicial, in whom is vested judgment and discretion, further than to compel him to proceed and exercise the judgment and discretion vested in him. All citizens are equally concerned in the discharge of a public duty, and any one of them has a right to apply for a mandamus to compel the performance of such duty. People v. Meakim, 56 Hun, 626, 10 N. Y. Supp. 161; People v. Daley, 37 Hun, 461. This application being for a peremptory writ, undisputed facts only will be considered. The statute provides that—

"The town board of every town containing more than four hundred voters, and the common council of every city, except New York and Brooklyn, in

which there shall be a ward containing more than four hundred voters, shall, at least thirty days before the election of inspectors of election, divide such town or ward respectively, into election districts, each of which shall be compact in form, wholly within the town or ward, and shall contain not more than four hundred voters. * * * A town, or a ward of a city, containing less than four hundred voters may, at least thirty days before the election of inspectors of election of such town or ward, be divided into election districts by the town board of the town, or the common council of the city, when, in the judgment of such board or council, the convenience of the voters will be promoted thereby. The creation, division or alteration of an election district shall not take effect until the town meeting or city election occurring next thereafter, and at such town meeting or city election inspectors of election shall be elected for such district." Laws 1892, c. 680, § 8.

It will be observed that the former provision of the statute referred to has reference to a town or ward containing more than 400 voters, while the latter provision has reference to a town or ward containing less than 400 voters; that in the former the word "shall" is used, while in the latter the word "may" is substituted. In the former the districts "shall contain not more than four hundred voters;" in the latter the town or ward may be divided into election districts "when, in the judgment of such board or council, the convenience of the voters will be promoted thereby." The difference in the language used indicates quite clearly the legislative intent. In case a town or ward of a city contained less than 400 voters, the division of it into election districts is left discretionary with the town board or the common council of the city, dependent upon the judgment of such board or council as to whether the division is necessary for the convenience of the voters. Authority is given to the town board or common council to divide the town or ward if the convenience of the voters would be promoted thereby, but as to towns or wards containing more than 400 voters very different language is used. There is no provision making the division dependent upon the convenience of the voters, or that leaves it discretionary with the town board or common council, but they "shall, at least thirty days before the election of inspectors of election, divide such town or ward respectively into election districts, each of which shall be compact in form, wholly within the town or ward, and shall contain not more than four hundred voters." The wording is mandatory, and such, I think, was the legislative intent. This view is strengthened from the history of the legislation upon this subject. By chapter 262 of the Laws of 1890 it was provided that—

"On or before the first day of September in the year 1890, and in each year thereafter, the officers now charged by law with the division or alteration of election districts, shall alter or divide the existing election districts, whenever necessary, in such manner that each election district shall contain not more than three hundred voters."

By chapter 296 of the Laws of 1891, it was provided that—

"On or before the first day of August in the year 1891, and in each year thereafter, the officers now charged by law with the division or alteration of election districts shall alter or divide the existing election districts, whenever necessary, in such manner that each election district shall contain not more than four hundred voters."

In each of these provisions we find that the division is authorized to be made each year, whenever necessary, thus leaving it open to the board or council to determine whether the division of the wards into districts was necessary. But in the provision of the statute under consideration the words "whenever necessary" were omitted, and evidently for a purpose. They were not overlooked or forgotten, for in the provision in reference to a town or ward containing less than 400 voters words having the same meaning or purport are used. The reason for omitting them from the provision pertaining to the division of wards containing more than 400 voters is disclosed by the opposing affidavits, in which it is shown that in former years, when the redistricting of the wards of the city was left discretionary with the council, many of them contained 1,600 and 1,700 voters, and, under the new system of voting through booths, the number of votes that can be cast at a polling place is necessarily limited. The statute provides that the district "shall contain not more than four hundred voters." This means persons living in the district who are entitled to vote. It is quite possible that many persons who are entitled to vote will refrain from doing so at the next election. Whether they will or not cannot now be determined. Doubtless very much will depend upon the issues raised and submitted to the electors for their determination; but the statute makes provision for all, and all may vote if they so desire. The charter of the city provides that—

"No action of the common council shall have force, unless it shall have originated in the board of aldermen and shall have been approved by the board of councilmen; but the board of councilmen may amend any measure transmitted to it, and return the same to the board of aldermen for further consideration. If the board of aldermen agree to such amendment, its action as amended shall be the action of the common council. If it shall not agree thereto and shall further amend, it may return the measure as finally passed by it to the board of councilmen for its further consideration." Title 2, c. 1, § 5.

The division of the wards into election districts must originate in the board of aldermen, but the board of councilmen may amend any measure transmitted to it. As we have seen, the board of aldermen took separate action as to each ward upon the resolution to divide into election districts, and the board of councilmen had the right to consider each ward separately, and, if the division into districts proposed by the aldermen was not proper or satisfactory, to amend the same, and return it to the board of alderman for further consideration. Instead of doing this, they took action upon all of the wards which were embraced in the resolution adopted by the board of aldermen at once. They approved of the redistricting of the Twenty-Fifth ward, and disapproved of the others. Upon this action the board of aldermen passed a further resolution including the Twentieth ward, and returned the same to the board of councilmen, and the same was laid upon the table. Some of the reasons given in the majority report of the board of councilmen for withholding its approval of the resolution of the board of aldermen, excepting so far as the Twenty-Fifth ward is concerned, have no

force in view of the fact that the statute is mandatory. It may be that in some of the wards the excess of voters over the statutory limit is so small that no attention would be paid thereto under the maxim "de minimis non curat lex," for the law will not take notice of mere trifles. If one or more wards were redistricted a year ago for the purpose of throwing out the inspectors of election, that action furnishes no excuse for the redistricting of the wards this year, for under the statute the inquiry is as to whether the district contains more than 400 voters, and the redistricting must depend upon the determination of that question. If, as is claimed, the new districts proposed by the board of aldermen contain more than 400 voters, the council was justified in refusing to approve of the resolution; but in that case it was its duty to amend the same so as to redistrict the wards into districts containing not more than 400 voters. The councilmen, in their majority report, concede that there are a large number of districts which exceed the statutory limit, but in their affidavit read in opposition to the motion they say that they are not satisfied that there are now more than 400 voters in said districts, or that more than 400 votes will be cast in said districts at the coming election. As I have shown, the question is not how many votes will be cast at the coming election, but is as to how many voters there are in the districts. No provision has been made by the statute as to how this question shall be determined. No appropriation has been made for a canvass. We, however, have the poll list of the registered voters at the last election, and the official canvass as to the number of votes polled at each polling place. The statute provides that in cities the names of such persons only as personally appear before the board of inspectors and are qualified voters shall be placed on the registry for a general election. A registry is required to be made before election, on the days designated, of each qualified voter in the district, by the entry of his name in a book prepared for that purpose, with the place of his residence. While the official registry may not furnish conclusive evidence as to the number of voters in the district, in the absence of fraud it furnishes quite satisfactory evidence that the number of voters registered are living in the district. A fire might sweep over a district, depopulating it; other events might transpire, working a change; but it is not pretended that anything of the kind has occurred in the city of Buffalo. The registry of 1892 shows a large number of districts that are in excess of the statutory number. Many contain upwards of 500 voters, and one as high as 723. The same is true in reference to the official canvass, except that in the canvass the excess is not so large, for the reason that some of the persons that registered in each district neglected to vote. Many of these districts are in wards not embraced in the resolution of the board of aldermen, and it is, therefore, apparent that, in order to faithfully execute the statute, several more wards should be included and redistricted.

But I am of the opinion that this application is premature. Under the statute the common council "shall, at least thirty days before the election of inspectors of election, divide," etc., and "the creation, division or alteration of an election district shall not take effect until the town meeting or city election occurring next thereafter, and at such town meeting or city election inspectors of election shall be elected for such district." In the city of Buffalo the charter election takes place at the same time, and on the same day, as the general election. The inspectors of election are elected at such time. It follows that a creation, division, or alteration of an election district will take effect at such election, and the division, if made, must be at least 30 days before such election. That time has not yet expired. More than a month yet remains in which the common council can discharge its duty in this regard. It is said that the board of councilmen has refused to redistrict certain wards that ought to be divided, and the reason given by it was that such redistricting was not necessary. That standing alone might be regarded as final action on their part; but they now make further answer thereto, saying that the new districts as described in the resolution of the board of aldermen contain more than 400 voters, and that this is one of the reasons for refusing to concur in the division of the wards made by the board of aldermen. They also deny that they have refused, and will continue to refuse, to perform their official duty, and redistrict the wards of the city. The action of the board of aldermen was treated by the board of councilmen as one resolution, and acted upon as such. It was approved in part, and repudiated in part, and returned to the board of aldermen, who further amended the same, and returned it to the board of councilmen, before which it is still pending. I do not think that this can be treated as final action upon the matter. I am aware of the rule that where public officers have refused to act, or have unreasonably delayed action, the mandamus will issue. People v. Meakim, 56 Hun, 626, 10 N. Y. Supp. 161; People v. Daley, 37 Hun, 461. But this rule is limited, and has exceptions. The rule applies where the statute imposes a duty upon public officers, and does not provide the time within which the duty shall be performed. But where the statute specifies the time within which the duty shall be discharged a different rule prevails. In such a case they have the right to act within the time specified, regardless of the question of unreasonable delay. High, Extr. Rem., at section 12, says:

"Mandamus is never granted in anticipation of a supposed omission of duty, however strong the presumption may be that the persons whom it is sought to coerce by the writ will refuse to perform their duty when the proper time arrives. It is therefore incumbent upon the relator to show an actual omission on the part of the respondent to perform the required act, and, since there can be no such omission before the time has arrived for the performance of the duty, the writ will not issue before that time."

See, also, People v. Wheeler, 18 Hun, 540. The rule, as stated by High, doubtless should be limited to cases in which the statute

specifically specifies the time within which the act must be performed, and has no application to a case where the time is not specified; for where the officer or person against whom the writ is demanded has clearly manifested a determination to disobey the laws, the court is not obliged to wait until the evil is done before issuing the writ. Attorney General v. City of Boston, 123 Mass. 460-474. For the reasons stated, the application for a peremptory writ of mandamus must be denied as premature, and, under the circumstances, without costs to either party. Application for mandamus denied.