SIMEON B. CHITTENDEN et al., Respondents, *v.* FREDERICK W. WURSTER, as Mayor of the City of Brooklyn, et al., Appellants.

1. CIVIL SERVICE CLAUSE OF THE CONSTITUTION. The provision of the Constitution (Art. 5, § 9) that "appointments and promotions in the civil service of the state, and of all the civil divisions thereof, including cities and villages, shall be made according to merit and fitness," is mandatory; but the execution of the subsequent provision: "to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive," is, as to the machinery necessary for the conducting of competitive examinations, dependent upon the statute.

2. COUNTIES, TOWNS AND VILLAGES. In the absence of legislation providing the machinery for conducting competitive examinations for the civil service of counties, towns and villages, the provision of the Constitution in reference to such examinations for those civil divisions of the state remains ineffectual.

3. STATE AND CITIES — CONSTITUTIONALITY OF CIVIL SERVICE LAW. The existing Civil Service Law (L. 1883, ch. 354, as amended), provides the necessary machinery for carrying into effect the provisions of the Constitution in the case of the state and cities, and, with the exception of certain provisions relating to veterans, appears to be in harmony with the Constitution.

4. PRACTICABILITY OF COMPETITIVE EXAMINATIONS. The provisions of the Constitution and of the statute, requiring competitive examinations so far as practicable, contemplated the existence of positions for which a competitive examination is not practicable.

5. DETERMINATION OF PRACTICABILITY OF EXAMINATION. In order to determine whether the examination of a candidate for an office is practicable, the court must first ascertain the nature and character of the duties of the position; and when that has been done, the question of exemption becomes one of law.

6. EXEMPTION OF CONFIDENTIAL POSITIONS. Within the meaning and intention of the Constitution and of the statute, competitive examination is not practicable for positions of a confidential relation to the appointing officer.

7. DEFINITION OF CONFIDENTIAL POSITION. Where the duties of the position are not merely clerical, and are such as especially devolve upon the head of the office, which, by reason of his numerous duties, he is compelled to delegate to others, and the performance of which requires skill, judgment, trust and confidence, and involves the responsibility of the officer or the municipality which he represents, the position should be treated as confidential.

44

8. CONFIDENTIAL POSITION NOT NECESSARILY SECRET. Positions included in the confidential class are not limited to those which are strictly secret.

9. STATUTORY EXEMPTIONS FROM EXAMINATION. The provisions of the statute, exempting from examination officers elected by the people and the subordinates of any such officer for whom he is financially responsible, the heads of city departments, applicants for employment under the educational department of a city, and any subordinate officers having custody of public moneys or securities for the safekeeping of which the head of an office is under bonds, furnish a satisfactory rule as to the positions for which, in addition to confidential positions, competitive examination is not practicable.

10. CITIES — EFFECT OF EXEMPT CLASSIFICATION BY MAYOR. A classification of positions exempt from civil service examination (Schedule A), made by the mayor of a city, presumably in the conscientious discharge of his duty under the statute, although it may be voidable is not void; and until judicially determined to be erroneous it is a protection to the subordinate heads of departments and employees acting thereunder, and, until the proper classification has been made, appointments made thereunder must be deemed valid.

11. REMEDY FOR IMPROPER CLASSIFICATION BY MAYOR. If the mayor of a city refuses to do his duty in making classifications of civil service positions, or if he does it improperly, he may be compelled by direct proceeding, as by mandamus, or perhaps in some cases by certiorari, instituted by any resident citizen, to do it in accordance with the requirements of the Constitution and of the statute; but a taxpayers' action to restrain the payment of salaries earned by appointees is not the appropriate remedy.

*Chittenden* v. *Wurster*, 14 App. Div. 483, reversed.

(Argued March 23, 1897; decided April 20; 1897.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered February 26, 1897, which affirmed a judgment in favor of plaintiffs entered upon a decision of the court on trial at Special Term.

The nature of the action and the facts, so far as material, are stated in the opinions.

*Joseph A. Burr* for appellants. The revised Constitution, which went into effect on the 1st day of January, 1895, has not repealed, modified or altered the provisions of the statute

relative to civil service appointments in the state of New York
(save only those portions of the statute which are in the
nature of exceptions to the general provisions thereof, such as
those respecting veterans). (L. 1883, ch. 354; L. 1884. ch.
410; *Koch* v. *Mayor, etc.,* 152 N. Y. 72; *Rathbone* v. *Wirth,*
150 N. Y. 470; Cooley's Const. Lim. [6th ed.] 69, 75; *In re
Sweeley,* 12 Misc. Rep. 174; 146 N. Y. 401; *In re Keymer,*
89 Hun, 292; 148 N. Y. 219; *People ex rel.* v. *Roberts,* 13
Misc. Rep. 448; 91 Hun, 102; 148 N. Y. 360; *People ex
rel.* v. *Civil Service Board,* 5 App. Div. 164; *People ex rel.*
v. *Tobey,* 8 App. Div. 468.) In making the necessary classi-
fication of positions, the determination to which class a posi-
tion shall be assigned and which method of appointment
shall be adopted is both by the Constitution and the statute
expressly made an administrative and not a judicial question.
(L. 1883, ch. 354, § 6; *Atty.-Gen.* v. *Northampton,* 143 Mass.
589.) The duty devolved upon the governor to classify the
positions in the state service, and the discretion conferred upon
him to determine as to the manner in which appointments to
such positions shall be made, and the like duty devolved and
discretion conferred upon the mayors of cities as to the munic-
ipal service, is not only not revoked by the Constitution, but
is necessarily continued until some other method is prescribed
by law. (*Wiggin* v. *Mayor, etc.,* 9 Paige, 16; *United States*
v. *New Orleans,* 31 Fed. Rep. 537; *State* v. *Bonner,* Busbee
Law [N. C.], 257.) The power of determination conferred
upon the governor to classify positions in the state civil service,
and upon the mayors of cities to classify positions in the city
service, if exercised honestly and in good faith, may not be
reviewed at all by any court. (Cooley's Const. Lim. 52, 54;
*People ex rel.* v. *Rice,* 135 N. Y. 473; *In re Baird* v. *Super-
visors,* 138 N. Y. 95; 142 N. Y. 523; *People ex rel.* v.
*Commissioners,* 149 N. Y. 26.) While a determination
arbitrarily and dishonestly exercised may be reviewed, it can
only be reviewed in a proceeding brought directly for that
purpose, either to correct an existing classification or to com-
pel a new one. (*Mills* v. *City of Brooklyn,* 32 N. Y. 495.)

The civil service provision of the Constitution, so far as the classification of positions and the method of making appointments is concerned, is not self-executing, but can only become operative through legislative provisions. (Cooley's Const. Lim. [6th ed.] 99; *U. S.* v. *Reese*, 92 U. S. 214; Const. N. Y. art. 8, § 14; *People ex rel.* v. *Fallon*, 4 App. Div. 82; *In re Keymer*, 148 N. Y. 219; Const. N. Y. art. 3, § 18.) In any event and under any circumstances an action in the form in which this action is brought will not lie. (L. 1894, ch. 681; *Talcott* v. *City of Buffalo*, 125 N. Y. 280; *Ziegler* v. *Chapin*, 126 N. Y. 342; *Adamson* v. *N. El. R. R. Co.*, 89 Hun, 261; *Terrell* v. *Strong*, 14 Misc. Rep. 258; *Rathbone* v. *Wirth*, 150 N. Y. 498; *Curtin* v. *Barton*, 139 N. Y. 505; Const. N. Y. art. 3, § 4; *Rogers* v. *Com. Council of Buffalo*, 123 N. Y. 173; *Peck* v. *Belknap*, 130 N. Y. 394.) The complaint should have been dismissed as to the defendants Newland and Perry, upon the ground that the proof did not conform to the allegations of the complaint. (*Southwick* v. *F. Nat. Bank*, 84 N. Y. 420; *Butler* v. *Farley*, 17 N. Y. S. R. 109; Code Civ. Pro. § 723; *Rome Exchange Bank* v. *Eames*, 4 Abb. Ct. App. Dec. 83; *Day* v. *Town of New Lots*, 107 N. Y. 148; *Kley* v. *Healy*, 9 Misc. Rep. 93.) If the court had the power in this form of action to determine whether error was made by the several mayors in determining that it was not practicable to fill the positions under consideration after competitive examination, the evidence wholly fails to show that either of said officials erred in their judgment in assigning them to the schedule to which appointment might be made without examination. (L. 1888, ch. 583; *People ex rel.* v. *Palmer*, 152 N. Y. 217.)

*Henry Yonge, J. Warren Greene* and *Edward M. Shepard* for respondents. The payment of salaries to officers appointed in violation of the civil service laws may be restrained by taxpayers' suits. (*Dolan* v. *Mayor, etc.*, 68 N. Y. 274; *Rogers* v. *Com. Council of Buffalo*, 123 N. Y. 173; *Peck* v. *Belknap*, 130 N. Y. 394; L. 1894, ch. 681; *Demarest* v. *Mayor, etc.*,

74 N. Y. 161; 1 Dillon on Mun. Corp. 93; Code Civ. Pro. § 1925; *Adamson* v. *N. El. R. R. Co.*, 89 Hun, 261; *Talcott* v. *City of Buffalo*, 125 N. Y. 280; *Ziegler* v. *Chapin*, 126 N. Y. 342.) If the Constitution meant what it said, that appointments must, where practicable, be made by competition, then these appointments were unconstitutional. (*Rogers* v. *Com. Council of Buffalo*, 123 N. Y. 177; *People ex rel.* v. *Roberts*, 148 N. Y. 366; *Sturgis* v. *Spofford*, 45 N. Y. 446; *Rathbone* v. *Wirth*, 150 N. Y. 468; *People ex rel.* v. *Draper*, 15 N. Y. 544; *In re Keymer*, 148 N. Y. 219; *People ex rel.* v. *Wilson*, 146. N. Y. 401.) The constitutional amendment operated as a limitation upon the power of appointment in whosesoever hands the power of appointment should be reposed. It was a limitation upon the legislative power itself, and *a fortiori*, upon the power of a mayor, who is himself a mere creature of legislative power, whose office can be abolished at legislative will. (*Demarest* v. *Mayor, etc.*, 74 N. Y. 161; 1 Dillon on Mun. Corp. 93; *People ex rel.* v. *Fallon*, 4 App. Div. 87; *Green* v. *Biddle*, 8 Wheat. 1; *Curran* v. *Arkansas*, 15 How. [U. S.] 304; *State* v. *Bank*, 1 S. C. [N. S.] 63; *Bowdoinham* v. *Richmond*, 6 Me. 112; *Barings* v. *Dabney*, 19 Wall. 1; *Davis* v. *Gray*, 16 Wall. 203.) The constitutional amendment made no exception in case of confidential positions. There was no such limitation in the act of 1883; if there had been, it would have been abolished by the Constitution. (*People ex rel.* v. *Palmer*, 152 N. Y. 217.) The existence of a duty on the part of a public officer to ascertain a fact required by law before performing an official duty does not imply the power to determine the fact. (*Miller* v. *Amsterdam*, 149 N. Y. 288; *Sharp* v. *Speir*, 4 Hill, 76.) No evidence was admitted that did not fairly bear on the question of practicability. There is no proof of practicability superior to the proof of what has been and is done either in Brooklyn or in other civilized communities. The testimony was all strictly competent and strictly relevant and material. But, if it were not, then the appellants can ask no more than that the inadmissible

testimony be eliminated.   If the remaining testimony support the finding below, the finding will stand in spite of exceptions to incompetent, irrelevant or immaterial testimony.   (*King* v. *Whaley*, 59 Barb. 71; *Apthorp* v. *Comstock*, 2 Paige, 482; *In re N. Y. C. & H. R. R. R. Co.*, 90 N. Y. 342; *Kelsey* v. *Cooley*, 11 N. Y. Supp. 745; *Forrest* v. *Forrest*, 25 N. Y. 501; *McSorley* v. *Hughes*, 58 Hun, 360; *Clapp* v. *Fullerton*, 34 N. Y. 190.)

HAIGHT, J.   This action was brought by taxpayers of the city of Brooklyn against the fiscal officers of the city and eleven individuals who were appointees in the various departments of the city government to enjoin and restrain the fiscal officers of the city from paying to any of the appointees the salary earned by them respectively.

The eleven employees were appointed to the positions held by them since the first day of January, 1895, without competitive examination; and the claim is that such examination in each case was practicable, and that every appointment without such examination was in violation of the provisions of the Constitution which went into force on that day.

Civil service first had its introduction in this state in the year 1883 by the passage by the legislature of chapter 354. That act has been several times amended; it related to appointments to be made in the civil service in the state and cities; and at the time of the adoption of the new Constitution, in substance provided that the governor, with the advice and consent of the senate, should appoint three persons as civil service commissioners of the state; that they should aid him in preparing suitable rules for carrying the provisions of the act into effect; and when the rules should be promulgated, it should be the duty of all officers of the state, in the departments and offices to which such rules relate, to aid in all proper ways in carrying the rules into effect.   The rules were required to provide and declare, as nearly as the conditions of good administration will warrant: " 1. For open competitive examinations for testing the fitness of applicants for the public

service now classified or to be classified hereunder. Such examinations shall be practical in their character, and, so far as may be, shall relate to those matters which will fairly test the relative capacity and fitness of the persons examined to discharge the duties of that service into which they seek to be appointed. 2. All the offices, places and employments so arranged or to be arranged in classes, shall be filled by selections from among those graded highest as the results of such competitive examinations. * * * 7. There shall be noncompetitive examinations when competition may not be found practicable."

It was made the duty of the governor, within four months, to cause to be arranged in classes the several clerks and persons employed or being in the public service, for the purposes of an examination, and he was required to include in one or more of such classes, *so far as practicable,* all subordinate places, clerks and officers in the public service of the state. Thereafter no officer or clerk was permitted to be appointed, admitted or promoted in either of the classes arranged by the governor until he had passed an examination or had shown himself to be exempted from such examination. It was made unlawful for the comptroller to draw his warrant for the payment of any salary or compensation to any officer, clerk or other person in the public service of the state in either of the classes arranged by the governor, who was not certified as having been appointed in pursuance of the law and of the rules and regulations made thereunder. In each of the cities of the state in which rules and regulations had been adopted under the provisions of the act, every officer thereof whose duty it was to sign or countersign warrants, was prohibited from signing or issuing any warrant on the treasurer, or other disbursing officer of such city, for the payment of the salary of any person in its service whose appointment had not been made in pursuance of the provisions of the act and of the rules in force thereunder, and any sums paid contrary to the provisions of the act, it was provided, might be recovered from any officer signing or countersigning warrants for the payment

of such salaries, and from the sureties on his official bond, in an action in the Supreme Court maintained by any resident citizen taxpayer. (Section 7, as amended by L. 1894, ch. 681.)

It was further provided that (§ 8) : " The mayor of each city in this State is authorized, and is hereby directed, to prescribe such regulations for the admission of persons into the civil service of such city as may best promote the efficiency thereof and ascertain the fitness of candidates in respect to character, knowledge and ability for the branch of the service into which they seek to enter, and for this purpose he shall, from time to time, employ suitable persons to conduct such inquiries and make examinations, and shall prescribe their duties and establish regulations for the conduct of persons who may receive appointments in the said service. And the regulations so to be prescribed shall, among other things, provide and declare as in the second subdivision of the second section of this act is provided and declared in reference to regulations for admission to the civil service of the state. Within two months after the passage of this act it shall be the duty of each of said mayors, in and by such regulations, to cause to be arranged in classes the several clerks and persons employed or being in the public service of the city of which he is mayor, and he shall include in one or more of such classes, so far as practicable for the purposes of the examination herein provided for, all subordinate clerks and officers in the public service of the said city to whom his power under this act extends. After the termination of three months from the passage of this act no officer or clerk shall be appointed, and no person shall be admitted to or be promoted in either of the said 'classes now existing or that may be arranged hereunder pursuant to said rules, until he has passed an examination, or is shown to be exempted from such examination, in conformity with such regulations. Such regulations hereafter prescribed and established, and any subsequent modification thereof, shall take effect upon the approval of the New York Civil Service Commission. * * * It shall be the duty of all those in the official service of any such city to conform to and comply with any regulations made pur-

suant to this act, and to aid and facilitate in all reasonable and proper ways the enforcement of all regulations and the holding of all examinations which may be required under the authority conferred by this section.   \*   \*   \*   And all examinations herein authorized shall be public, and all regulations shall be published." (As amended by L. 1894, ch. 410.)

Under the provisions of this statute it was made the duty of the mayor of the city of Brooklyn to arrange in classes all clerks and persons employed in the public service of the city, and to include in one or more of such classes, *so far as practicable* for the purposes of a competitive examination, all the subordinate clerks and officers in the public service of the city.

In compliance with these provisions, the Honorable Seth Low, then mayor of the city, did prescribe rules and regulations for the admission of persons into the public service of the city, and did arrange a class known as "Schedule A," in which were enumerated the positions in which he did not deem a competitive examination practicable; and another class known as "Schedule B," containing positions in which he required a competitive examination as a condition precedent to an appointment. Among others he classified as positions in "Schedule A" that of clerk to the committees of the board of aldermen, warrant clerk in the department of finance, dockmaster in the department of finance, chief clerk in the department of audit and law clerk in the department of law. These rules and regulations went into operation under his administration and ever since have continued to be in force, except as to the following modifications made by his successors: Mayor Charles A. Schieren classified the clerk in the department of health, the surveyor in the department of assessments, the secretary in the department of buildings, and the deputy license clerk in the city clerk's office, in "Schedule A;" and Mayor F. W. Wurster, one of the defendants herein, classified the license fee collector in the department of fire in "Schedule A." The head of each of these departments was required to and has given the usual official bond. The eleven appointees,

45

defendants, were appointed to the positions above named, classified in " Schedule A." They were not, therefore, required to pass a competitive examination, unless the classifications made by the mayors were in conflict with the provisions of the Civil Service Statute, or violative of the provisions of the Constitution.

The Constitution, article 5, section 9, provides that " appointments and promotions in the civil service of the state, and of all the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive; provided, however, that honorably discharged soldiers and sailors from the army and navy of the United States in the late civil war, who are citizens and residents of this state, shall be entitled to preference in appointment and promotion, without regard to their standing on any list from which such appointment or promotion may be made. Laws shall be made to provide for the enforcement of this section."

The concluding clause, to the effect that laws shall be made to provide for the enforcement of this section, would seem to indicate that it was within the contemplation of the constitutional convention that some legislation would be necessary. The Civil Service Statutes were limited to the state and the cities. The Constitution extends the civil service to all the civil divisions of the state, including villages. Counties and towns are the civil divisions of the state, and are, therefore, with villages, now included in the civil service. Appointments and promotions " shall be made according to merit and fitness." This provision is doubtless mandatory. It asserts a duty which has always existed, and devolves upon every appointing officer of ascertaining the merit and fitness of the persons appointed by him to official positions. Then follows the provision : " To be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive." In order to have a satisfactory and effectual competitive examination there must be some person to examine and decide, some place fixed, and

notice given in order that the applicants may be able to appear and have a hearing. The Constitution has made no provision with reference to the appointing of examiners, or for the manner in which the examinations shall be made, or how the qualifications of the applicants shall be determined. This it has left to the legislature. This view is in accord with the former determinations of this court.

In the *Sweeley Case* (12 Misc. Rep. 174), Judge HERRICK, in discussing this provision of the Constitution, says that it does not prescribe the rules by which it may be enforced, and that it needs legislation to give it life. This case was affirmed by this court without opinion (146 N. Y. 401), and his opinion was especially commended by Judge BARTLETT in the *Keymer Case* (148 N. Y. 219, 224). In the *McClelland Case* (91 Hun, 101) the same judge discussed this question more fully, and held that the execution of this provision was dependent upon the statute. That case was also affirmed by this court (148 N. Y. 360), and the opinion below was commended by O'BRIEN, J., who said, with reference to this clause of the Constitution, that it is subject to legislative regulation as to the mode and manner of appointment, and is brought within the operation of general laws on that subject. It is true that in another place he stated that, "If the legislature should repeal all the statutes and regulations on the subject of appointments in the civil service the mandate of the Constitution would still remain, and would so far execute itself as to require the courts, in a proper case, to pronounce appointments made without compliance with its requirements illegal." But, in making this statement, he had reference to the mandatory provision already alluded to, as appears from the clause immediately preceding, and not to the necessary machinery for the conducting of a competitive examination. This is apparent from another expression appearing in his opinion in which he refers to the provision and states that "it was framed and adopted with reference to existing laws which were intended to give it immediate practical operation." This view is in harmony with that now entertained by us. The provision is

mandatory in the respects alluded to, but, as to the machinery necessary for the conducting of a competitive examination, its execution to that extent is dependent upon the statute. In counties, towns and villages, no examiners have been provided or provisions made for the carrying of this clause into effect. It is said that each officer having appointments to make could himself examine the applicants for position, and in that way determine who should be the appointee by a competitive examination. Undoubtedly, but it will readily be seen that this system would practically nullify the Civil Service Law and bring it into disrepute. The learned counsel for the respondents says that there was " neither statutory nor executive machinery for putting the amendment into effect in villages, so it may be well that as t        llages the amendment will, until there shall be legislation, remain ineffectual." We quite agree with him in this regard. What is true with reference to villages is also true with reference to counties and towns. This question has just been considered by us in the case of *People ex rel. Inebriates' Home for Kings County* v. *Comptroller of Brooklyn* (152 N. Y. 399), to which we here refer for a further discussion of the question.

There were, however, in existence at the time of the adoption of the Constitution the statutes to which we have alluded, which do provide the necessary machinery for carrying into effect the provisions of the Constitution in the state and cities; so that, upon its adoption, in the language of O'BRIEN, J., in the *McClelland* case, " it had immediate practical operation."

Article 1, section 16, of the Constitution provides that " such acts of the legislature of this state as are now in force, shall be and continue the law of this state, subject to such alterations as the legislature shall make concerning the same. But all such parts of the common law, and such of the said acts, or parts thereof, as are repugnant to this Constitution, are hereby abrogated."

Are the provisions of the Civil Service Act repugnant to the provisions of the Constitution? In the *Keymer Case* (*supra*) we held that the provision of chapter 344 of the Laws

of 1895, which exempted honorably discharged soldiers and sailors in the late civil war from competitive examination, where the compensation did not exceed four dollars per day, was in conflict with the provisions of the Constitution. But our attention has been called to no other clause of the statute which appears to us to be repugnant to the Constitution. O'Brien, J., in the *McClelland* case, says that it was "framed and adopted with reference to existing laws." In the *Sweeley Case (supra)* it was said: "The Civil Service Law of the state, as it was prior to the adoption of the new Constitution, is, with the exception of the acts which have been passed relative to soldiers, in harmony with the Constitution." It is claimed that the Constitution prescribes a different rule for the ascertainment of the merit and fitness of those who are candidates for appointment from that provided in the statute. It is, as we have seen, that the merit and fitness shall be ascertained, so far as practicable, by competitive examination. The statute provides that the governor shall adopt rules which shall provide, as nearly as the conditions of good administration will warrant, for open competitive examination, for testing the fitness of applicants. And again, "He shall cause to be arranged in classes the several clerks and persons employed or being in the public service, for the purpose of examination herein provided for, and shall include in one or more of such classes, *so far as practicable,* the subordinate places, clerks and officers in the public service of the State." And with reference to the cities, the statute provides that the mayor shall prescribe regulations for the admission of persons into the civil service "as may best promote the efficiency thereof, and ascertain the fitness of candidates in respect to character, knowledge and ability, for the branch of the service in which they seek to enter." And again, "He shall cause to be arranged in classes the several clerks and persons employed or being in the public service of the city of which he is mayor, and he shall include in one or more of such classes, *so far as practicable,* for the purposes of examination herein provided for, all subordinate clerks and officers in the public service of

said city," &c. It will be seen that the language used with reference to the classification in the state by the governor, is, " The several clerks and persons employed," while that pertaining to the city is, " all subordinate clerks and officers." It is not pretended that the constitutional provision was intended to apply to the heads of departments, but that it only has reference to the subordinates. The statute requires classification for competitive examination, " so far as practicable;" the provisions of the Constitution are to the same effect. It consequently appears to us that the existing statutes, in so far as they have been considered, with the exception mentioned, are in harmony with the provisions of the Constitution.

We are thus brought to a consideration of the question as to whether the classification made by the mayors of Brooklyn is legal. As we have seen, with the exceptions noted, it has existed for nearly thirteen years without question. This fact, however, may not excuse us from now considering the question, in view of the fact that changes have been made which would render the doctrine of practical construction inapplicable. In determining this question, we must have reference to the mandate of the Constitution and of the statute requiring competitive examination so far as practicable.

It was evidently contemplated that there were positions in which a competitive examination was not practicable. (*Matter of Keymer*, 148 N. Y. 219.) The counsel for the respondent conceded this, and in his oral argument mentioned a position in the health department, and in his brief, " a private secretary, or an officer or attendant especially assigned to an executive or judge." The reasons for exempting the private secretary of the governor, or the personal attendant upon a judge, exist with equal force with reference to many other positions, and it would be manifestly unjust to limit the exceptions to the positions named. In order to determine whether the examination of a candidate for an office is practicable, we must first ascertain the nature and character of the duties of his position. Having ascertained the facts, the question of exemption then,

doubtless, becomes one of law, as was held by the majority of the judges composing the Appellate Division. In the classifications which have been heretofore made in the state and cities, there has been a reservation from competitive examinations of those occupying confidential relations to the appointing officer; this it is now claimed is unauthorized, for the reason that confidential relations are not mentioned in the Constitution. It is conceded, however, by the respondent's counsel that, as to the positions mentioned by him, they ought to be excepted. Confidential positions must be classified either one way or the other. Competitive examination is or is not practicable as to such positions. We have carefully read the evidence in this case, and not a word have we found tending to show that a competitive examination is practicable for a position where the appointee is to receive, open, read and answer the letters of his chief, where he is to counsel and advise him with reference to the conduct and management of his office, sign his name to checks or warrants, collect and pay out his money, have the combination of his safe and the custody and control of its contents. A candidate may be ever so competent and still lack many of the necessary elements of a trustworthy officer; he may be ever so learned and still lacking in judgment and discretion ; he may be discreet and still without character ; he may be honest and yet meddlesome and a person in whom you could not confide. To our minds the framers of the Constitution or of the statutes never contemplated or intended that a competitive examination was practicable for such a position.

What places should then be included in the confidential list ? This question may not be easy of solution. Facts may arise with reference to positions which are now unknown, or not presented by the record before us, which we cannot foresee or now consider. We can, therefore, only speak generally upon the subject, leaving individual cases for consideration when they arise. We think the Civil Service Laws should have a reasonable interpretation and should be made as practical as possible, and that we should avoid a construction

rendering them so burdensome as to array public sentiment against them. We have recently had occasion to consider this question to some extent in the *Crummey Case* (152 N. Y. 217). That case arose under another statute, but was so closely akin to that under consideration as to give it an important bearing. We then regarded and still consider that case upon the border line, beyond which we should not go. We then were of the opinion that where the duties of the position were not merely clerical, and were such as especially devolved upon the head of the office, which, by reason of his numerous duties, he was compelled to delegate to others, the performance of which required skill, judgment, trust and confidence and involved the responsibility of the officer or the municipality which he represents, the position should be treated as confidential. We have not changed our views upon the subject. We think that this rule, properly applied, will not prove unreasonable, and that it will not exempt from examination many positions. It doubtless would relieve one warrant clerk in an office where the duties were the same as those which devolve upon Crummey; but the work of an office would have to be great, and it would have to distinctly appear that one could not discharge the duties of the position in order to justify the exemption of more than one. We have said that we did not think this rule would prove unreasonable; should time and experience prove that we are in error in this regard, we shall not hesitate to apply further limitations, so as to carry out the spirit and intent of the law.

We are urged to limit the positions in the confidential class to those which are strictly secret. Most of the public offices are conducted openly, and every citizen has the right to know what transpires. The strictly secret positions authorized are comparatively few, and are of far less importance than those where the appointee is intrusted with the drawing and signing of warrants for the payment of millions of dollars of the public money. Such a construction would be too narrow and burdensome, and we think not justified. As to the other positions in which competitive examination is not practicable,

the statute itself furnishes a satisfactory rule; it provides as follows : " Officers elected by the people and the subordinates of any such officer, for whose errors or violation of duty such officer is financially responsible, and the head or heads of any department of the city government and persons employed in or who seek to enter the public service under the educational departments of any city, and any subordinate officer who by virtue of his office has personal custody of public moneys or public securities, for the safekeeping of which the head of an office is under official bonds, shall not be subject to the regulations prescribed pursuant to this section." (§ 8, as amended by L. 1884, ch. 410.) This statute bears the impress of careful study and thought. Under our system of government it has been thought wise to hold public officials to strict accountability for the management of their offices and for the faithful accounting for public moneys coming into their hands. So strict is the law in this regard that in most cases they are held responsible for losses which occur even without their fault. (*Tillinghast* v. *Merrill*, 151 N. Y. 135.) To insure an accounting they are required to give official bonds. If they delegate to appointees the handling of public moneys, they still remain responsible for their acts and usually protect themselves by requiring such appointees to furnish bonds. All these facts were evidently taken into consideration in framing the provision in question. It was not thought to be just to hold an official responsible for the acts of an employee who necessarily had the custody of public moneys when the official had no choice in his selection. Under the rules established by the civil service commission, the appointment must be made from a list of three who are certified as standing the highest. Neither of the three persons may be personally responsible. The officer has no power to demand a bond or other security ; and yet, upon his own personal responsibility he may be compelled to intrust the appointee with the handling of the entire tax receipts of a state, or of a large and populous city. The legislature was not willing to release officials from responsibility for public moneys, and it did not deem a

46

civil service examination as practicable or a sufficient protection to such officers; it, therefore, and we think properly, exempted such positions from the general operation of the act.

The provision with reference to those seeking to enter the employment of the educational departments of the city relates to teachers in schools. There are other statutes which require them to pass an examination and obtain a certificate before they can be employed. This examination was deemed equivalent to that required under the Civil Service Acts, and they consequently were exempted. The positions embraced in the above provision of the statute, together with those included in the confidential list, constitute the exempt class, commonly known in the classification as " Schedule A."

In view of the disposition to be made of this case, we are not now called upon to determine the respective claims of the eleven appointees. We have reached the conclusion that this action ought not to be maintained. The heads of the departments making the appointments had nothing to do with the classification; that duty devolved upon the mayor. Under the classification made each of the positions in controversy was placed in " Schedule A." The positions in " Schedule A " required no examination, and consequently no lists were prepared by the examiners from which such positions could be filled. It is not pretended that the mayor was corrupt, dishonest, or that he was actuated by improper motives in making the classification. The duty devolved upon him under the statute; and, until the contrary appears, we must assume that he acted conscientiously and upon his best judgment. Such a classification is not void; it may be voidable, for his action is subject to review; but, until it is judicially determined that his classification was erroneous, it is a protection to the subordinate heads of departments and employees acting thereunder. The appointments were made in accordance with the statute and the classification as it then existed. They could then be made in no other way; and, until the proper classification had been made, the appointments must be deemed valid. (*Curtin* v. *Bar-*

*ton*, 139 N. Y. 505.) The same conditions would exist with reference to the positions vacated by the removal of the incumbents, in case this judgment should be affirmed. There would be no lists from which new appointments could be made. Under the system in force, the examiners prepare a list for each office to be filled in the competitive schedule, and the appointments have to be made from that list. The examinations have reference to the particular duties to be performed; consequently, a list prepared for bookkeepers would not answer for surveyors, nor a list for warrant clerks supply applicants out of which doctors could be appointed upon the board of health. While lists have been prepared for the places enumerated in "Schedule B," none have been made for the positions in the exempt "Schedule A;" so that, before the head of a department could fill a position made vacant by this judgment, he would have to go to the mayor, get him to revise the classification, and put the position in "Schedule B." He would then have to wait until the examiners could publish the proper notice, make the examinations and prepare a list out of which the appointment could be made. Should the mayor refuse to revise his classification, then the head of the department would be powerless to fill the position, except in the manner in which the defendant's appointments were made. It is said that the mayor would make the change in the schedule upon the application of the heads of the departments. Very likely; but whether he would or not, we are not advised. We are considering the legal proposition founded upon the record before us. It does not disclose any willingness on his part to change the classification. The change has not been made, and in determining the legal proposition, we must treat the case accordingly.

The people are not, however, without a remedy. There is one which is very simple and effective; if the mayor refuses to do his duty, or if he does it improperly, he may be compelled by direct proceeding, as by mandamus, or perhaps in some cases by certiorari, instituted by any resident citizen, to do it in accordance with the requirements of the Constitution

and of the statute. The courts have the power to compel the discharge of such duties. By making the classification conform to the statute, heads of departments and officers acting thereunder, making appointments, will not subject their appointees, dependent upon compensation for their services, to the loss of wages earned or salaries accrued. In this situation it is obvious that the taxpayers' action is not the appropriate remedy. (Laws 1887, chap. 673 ; *People ex rel. Boltzer* v. *Daley,* 37 Hun, 461, 466 ; *People ex rel. Wright* v. *Common Council of Buffalo,* 16 Abbott's N. C. 96 ; affirmed, 38 Hun, 637, on opinion below ; appeal dismissed, 101 N. Y. 640 ; *People ex rel. Smither* v. *Richmond,* 5 Misc. Rep. 26, 29 ; *People ex rel. Overton* v. *Board of Trustees of the Village of Whitestone,* 71 Hun, 188 ; *People ex rel. Stephens* v. *Halsey,* 37 N. Y. 344 ; *People ex rel. Case* v. *Collins,* 19 Wendell, 56.)

We have to say in conclusion that the duty rests upon the legislature and the courts to enforce the civil service provisions of the Constitution in their letter and spirit.

We doubt not that at an early day the legislature will supplement the existing civil service laws by such additional enactments as will cover all the civil divisions of the state, including villages, and furnish a complete system for carrying out the mandates of the Constitution.

We have endeavored to solve the complicated problems presented by this appeal so that the appointing officer, the fiscal agent and the appointees shall be protected until final judgment can be had as to the correctness of classification, and at the same time we have pointed out to the citizen the remedies by which he can secure the enforcement of civil service provisions contained in the Constitution and the statutes.

The judgment should be reversed and the complaint dismissed.

GRAY, J., (dissenting). This action was brought by certain taxpayers of the city of Brooklyn against the mayor and the other fiscal officers of the city and eleven individuals, who had been appointed to various positions in the

municipal service, for the purpose of obtaining a judgment which should restrain the payment of the salaries of such appointees. These appointments were made subsequent to the 1st day of January, 1895, and the positions were as follows: Clerk to the committees of the board of aldermen; assistant warrant clerk in the department of finance; dockmaster in the department of finance; chief clerk in the department of audit; law clerk in the department of law; surveyor in the department of assessment; finance clerk in the department of health; license fee collector in the department of fire; secretary in the department of buildings; clerk to the commissioner of city works, and deputy license clerk in the city clerk's office. The complaint charged that these appointments had been made without the appointees having been subjected to competitive examinations to ascertain their merits and fitness and that, for the failure to comply with the law, the appointments were illegal. The answers admitted the allegation of the complaint with respect to the manner of the appointments and alleged that the defendant city officials, who were charged with the duty of the payment for services performed, intended to perform that duty as to the defendant appointees. The answer further alleged, with respect to each of the appointees, that he was duly appointed to his position.

Upon the trial of the action the plaintiffs adduced evidence, by the examination of witnesses and in the production of a large number of documents, consisting of examination papers, reports, various civil service regulations, etc., to show that competitive examinations for all the appointments mentioned in the complaint were practicable. No witnesses were called in behalf of the defendants, and the only evidence adduced by them consisted in showing, by stipulation and by certain letters addressed by Mayors Schieren and Wurster to the civil service commissioners between March, 1894, and February, 1896, that the positions of the defendant appointees, in the several departments, had been assigned to Schedule "A," which is the non-competitive schedule under the civil service regulations, before the appointments were made.

At the Special Term, the trial justice stated, among the grounds of his decision, that each of the defendant appointees to positions in the city of Brooklyn had been appointed " without an ascertainment of his merit and fitness for such position by competitive examination ; " and " that it was and is practicable to ascertain the merit and fitness of a person to be appointed to each of said positions by competitive examination."

I think that the right to maintain this action turns, in the first place, upon the existence of any authority in the law for it and, in the second place, upon the effect which the insertion into the present Constitution, of the civil service section (Art. V, sec. 9), had upon existing statutes and political conditions. In view of the objection that an action in this form will not lie, its prior discussion seems the more appropriate. Authority for it must be found in the provisions of the Code of Civil Procedure and in chapter 673 of the Laws of 1887. Section 1925 of the Code provides that " an action to obtain a judgment preventing waste of, or injury to, the estate, funds, or other property of a county, town, city or incorporated village of the state, may be maintained against any officer thereof,  * * *  by a citizen, resident therein,  * * *  who is assessed for and is liable to pay,  * * *  a tax," etc. This section was a revision of chapter 161 of the Laws of 1872, which was the first enactment upon the subject. The act of 1887 provided for an action against " all officers, agents, commissioners and other persons acting,  * * *  for and on behalf of any  * * *  municipal corporation in this state,  * * *  to prevent any illegal official act on the part of any such officers,  * * *  or to prevent waste or injury  * * *  to any property, funds, or estate of such  * * *  municipal corporation." Upon a consideration of the broad application, which has been given to these statutory provisions by the decisions of this court, I do not think that the inquiry into the right of these plaintiffs to maintain this action can be said to be really open to us in the present case. The Taxpayers' Act was passed by the legislature with the intent thereby to provide a sufficient and ready remedy against

all acts of public servants and agents, deemed wrongful and by which taxpayers might be prejudiced. They were, in great measure, helpless before; and the act was designed to furnish them a legal remedy, by way of a civil action to prevent injury to the municipal estate, or the commission of illegal official acts. There have been pertinent instances of actions brought under the authority of the statute; to some of which I will refer. *Rogers* v. *City of Buffalo* (123 N. Y. 173), was an action brought by a taxpayer of the city to restrain the common council, mayor, etc., of the city from paying the salary of the street and health inspector, on the ground that his appointment was in violation of the Civil Service Law, and a recovery was sustained. *Talcott* v. *City of Buffalo* (125 N. Y. 280), was an action by a taxpayer of the city to restrain the municipal authorities from substituting electric street lighting for that of gas in certain parts of the city. The question for determination there was, whether a taxpayer can maintain an action to restrain the governing body in a city from official action, within its power and discretion, in the absence of some charge of fraud, collusion, corruption or bad faith. It was observed that the terms "waste" and "injury" used in the statute, which gives a right of action to a taxpayer as against municipal officers, comprehend illegal, wrongful, or dishonest official acts and were not intended to subject official action to the supervision of judicial tribunals, where it was within the jurisdiction and discretion of the officers or municipal bodies. If the municipal authorities had not had the power to provide for the regulation and lighting of the city's streets, so as to leave the method to be adopted within their discretion, our decision would have upheld the judgment recovered below, because of the illegality of the municipal action. Improvidence, or lack of wisdom, would not warrant such an action. *Zeigler* v. *Chapin* (126 N. Y. 342), was an action brought by a taxpayer of the city of Brooklyn against the mayor and other officials to annul a contract made by them for the purchase of the property of a water company. It was there held that the action was main-

tainable, upon the ground that the contemplated purchase by
the mayor and his associates was beyond their authority and
illegal. It was said that "the action authorized by section
1925 of the Code is one which the taxpayer may bring against
the public officer because of some fraud or bad faith on his
part, or to restrain some illegal action." *Peck* v. *Belknap*
(130 N. Y. 394), was an action brought by a taxpayer of the
city of Rochester to restrain the mayor from entering into a
contract of employment with the defendant Belknap and to
restrain the city clerk and treasurer from paying him any
moneys. The ground of the action was that Belknap had not
passed the civil service examination. It was held that Belk-
nap's admission into the service of the city was plainly illegal ;
because, under the disqualification of the Civil Service Law,
the city could not employ an individual not eligible under the
law. It was held that, under section 1925 of the Code of
Civil Procedure and chapter 673 of the Laws of 1887, an
action is expressly authorized for the protection of taxpayers
against municipal officers, to prevent any illegal official acts
on their part, or to prevent waste, or injury, to the property
or funds of the corporation.

It seems to me that these cases have fully committed this
court to the doctrine that the statutes comprehend all cases,
where the wrong to be remedied consists either in a waste of,
or an injury to, the municipal estate, through corrupt official
action, or through action in abuse of the powers conferred on
municipal bodies, or in the commission of illegal official acts.
Nor should the scope of the remedy given by the legislature
be too much restricted by construction. As it was said in
*Ayers* v. *Lawrence* (59 N. Y. 192), which was the first case
in this court of an action brought under the Taxpayers' Act,
"in the construction of laws of the character of that under
consideration, too much stress should not be laid on the strict
and precise signification of words, but they should be con-
strued liberally, with a view to the beneficial end proposed,
to wit, the suppression of the mischief and the advancement
of the remedy." It was there observed of the law, that its

language was "sufficiently comprehensive to embrace every wrong by which taxpayers may be prejudiced, as within the purview of the act, if not within the literal and precise meaning of the words." Upon this head of the appeal, I am not inclined to entertain any doubt as to the right of the plaintiffs to bring their action to prevent the defendant Brooklyn city officials from paying salaries to those defendants, who are alleged to have been appointed to positions in the municipal service without a competitive examination as to their merits and fitness, as prescribed by law, and to be, therefore, holding such positions illegally.

We have, then, to consider what was the effect of the insertion into article V of the Constitution, as amended in 1894, of section 9, which reads as follows: "Appointments and promotions in the civil service of the state, and of all the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive; provided, however, that honorably discharged soldiers and sailors from the army and navy of the United States in the late civil war, who are citizens and residents of this state, shall be entitled to preference in appointment and promotion, without regard to their standing on any list from which such appointment or promotion may be made. Laws shall be made to provide for the enforcement of this section."

I believe this state to be the only one where such a provision affecting its civil service has, thus far, been made a part of its fundamental law, and we are bound to assume, by reason of its presence there, and by reason of all the circumstances attending its insertion, that it was a most deliberate expression of the views of the representatives of the people. In the consideration of the object and purport of a constitutional provision, it is useful to regard the circumstances attending, and leading to, its insertion. The reform of the civil service had long been the subject of discussion and of legislation, here and elsewhere. Examinations, whereby appoint-

ments to places in the public service might rest upon merits and fitness, had been provided for in England, some years before the first of our acts upon the subject was passed in 1883. It became evident there, as here, that they were of great value as agencies for the improvement and elevation of the public service, and the project of civil service reform made rapid progress. Not only in that most important respect, but, also, in the personal gain to the executive heads of departments, who were relieved of the burden and the responsibility of selecting competent subordinates, it commended itself to the general approval. The people of the state have now formally and solemnly declared at the polls that appointments to public places shall be made upon the basis of merit and fitness, to be ascertained, so far as practicable, by competitive examinations. Their will in that respect has been expressed in the most impressive manner, by being embodied in the fundamental law of the state.

That it should be given full effect, no one will deny and one of the questions, which confronts us, is whether, as the appellants contend, it can only become operative through legislative provisions. They argue that the provisions of this section simply indicate the principles, in accordance with which appointments must be made, and that, being affirmative in character, they are not self-executing, until a law is passed providing for some method of determination and classification in accordance with those principles. The argument, while having some force, in so far as the civil divisions of the state, other than cities, are concerned, where the legislature has failed to make a classification, or to provide some adequate machinery, through regulations or boards of examiners, fails to appreciate the positive and imperious nature of this constitutional mandate. The argument would make of the provision a direction, without imperative force. This is not the presumption we may indulge in, when we read the language and consider the very apparent design to protect the people against the evil effects of unfitness in those filling subordinate positions in the public service. From the time that the revised

Constitution of 1894 went into effect, it commanded that all appointments should be made according to merit and fitness, to be ascertained, when practicable, by the test of competitive examinations. Every officer, charged with the duty of appointing his subordinates in office, in taking his oath of office, bound himself to obey it as the supreme law of the state and to carry it into effect as faithfully as it was in his power. It needed no legislation to give force to the command; however legislation might be needed, in order that the appointing officer might be enabled by the aid of proper machinery to competently fulfill his oath in making appointments. To use an illustration of the respondents' counsel, the neglect or refusal of the legislature to pass appropriate laws, might make the constitutional command as ineffectual, as would be the case of its failure to obey the command to provide for a constitutional convention every twenty years. Would the command be any the less imperative? There is much more in this section than an indication of the principles upon which appointments must be made; there is the establishment of a fundamental principle, which, while the constitutional provision remains, is a supreme law for the state and which is self-executing in all cases, where the legislature has provided the ways and means for compliance with its requirements.

The provision in the section, that "laws shall be made to provide for the enforcement of this section," re-enforces its positive command. So far as laws do not already exist, which permit the mandate to be effectual, there shall be further legislation in the line of regulations. I do not see how the *Sturgis Case* (152 N. Y. 11), which arose under the lottery clause of the Constitution (Art. 1, sec. 9), and to which counsel refers, commits us to any different view of the language of this section. It was there held that the lottery section was not intended to be self-executing; because of its language, that "the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section." This was an express delegation of authority to the legislature to enact laws, by which the section should be given force. The

legislature was, in effect, directed to enact laws for the definition, prevention and punishment of crimes coming within the general language of the section, which forbade that any lottery, poolselling, bookmaking, or any other kind of gambling, shall " be authorized or allowed within this state." That section is very different in its language from the one we are considering; where we have the positive and unmistakable utterance of a command upon the subject of appointments and where the only room for legislation is in the sphere of providing ways and means for a general and faithful compliance by executive officers.

I have suggested that the section was framed as a deliberate expression of the views of the representatives of the people in the constitutional convention, held in the year 1894. Civil service reform had then passed the tentative stage. In 1883 an act had been passed relating to appointments in the civil service of the state, which provided for the making of rules and regulations for the examination of persons seeking admission into the civil service of the state, or of the cities of the state. (Chap. 354, Laws of 1883.) The original statute had been made the subject of many amendments, down to the legislative session of 1894. Regulations had been promulgated by the governor and by mayors of cities, civil service commissions had been appointed and, in the decade that had elapsed since the passage of the first law, the public attention had been directed to the development and results of this plan for elevating and improving the civil service. Civil service examinations had not gone unchallenged as to their efficacy and the antagonism had been pronounced. The proposed amendment of the Constitution was introduced as early as in the month of June, in the session of the constitutional convention of 1894. It was taken up in the month of September and made the subject of prolonged debate. I think we may, safely and fairly, presume that the members of the convention had actually, and well, in mind, not only the public proceedings had in legislative and administrative bodies upon the subject, but, as well, what the operation of the law had been reduced to in practice.

It may not amount to a legal presumption of knowledge as to all the details of its working; but, in considering the duty resting upon a deliberative body, chosen to revise the Constitution of a state, I regard it as a proper and natural presumption to indulge in, that the working of the law in practice and the conditions brought about by rules and regulations, were the subject of study and of reflection.

The civil service article for cities provided that " the mayor of each city in this state is ＊ ＊ ＊ hereby directed to prescribe such regulations for the admission of persons into the civil service of said city, as may best promote the efficiency thereof, and ascertain the fitness of candidates in respect to character, knowledge and ability for the branch of the service into which they seek to enter, and for this purpose, he shall, from time to time, employ suitable persons to conduct such inquiries and make examinations," etc. Such regulations, by the article, were to provide and declare, as in the case of admission to the civil service of the state, " as nearly as the conditions of good administration will warrant," for open and competitive examinations for testing the fitness of applicants; which should be practical in their character and fairly test the relative capacity and fitness of the persons examined, and that " all of the offices, places and employments ＊ ＊ ＊ shall be filled by selections from among those graded highest as the result of such competitive examination." The mayor was required to arrange in classes the clerks and persons employed in the public service of the city, and " he shall include in one or more of such classes, so far as practicable for the purposes of examination herein provided for, all subordinate clerks and officers in the public service of the said city," etc. The further provisions of the article relate to the exemption from the regulations, prescribed pursuant to the section, of elective officers and the subordinates, for whose errors they were financially responsible; of heads of departments; persons in the educational departments, and every subordinate officer, who, by virtue of his office, had personal custody of public funds, for the safekeeping of which the head of the office was under official

bonds. (Laws of 1883, chap. 354, sec. 8, as amended by Laws of 1884, chap. 410, sec. 2.) Under this article, regulations were variously promulgated; and, as we are concerned with those prescribed by the mayors of Brooklyn, we shall refer to them. They provided for three schedules, termed A, B, and D. Schedule A included places for which appointments might be made without examination. Schedule B included places to be filled upon a competitive examination. Schedule D included the cases of laborers and day workmen. It was, also, provided by the regulations that all new or omitted positions shall be deemed to be in Schedule B; unless the assignment of such positions to some other schedule be made by the mayor, and this evidences that that schedule was to be regarded as containing the general rule in the making of appointments. Classification was made into schedules of the various clerks and persons employed in the city service and, thereafter, from time to time, were made assignments by the mayors of positions to the non-competitive schedule; so that, prior to January 1, 1895, when the revised Constitution went into effect, six of the positions filled by the appointees, defendants in this action, were assigned to that schedule and, after that date, five were so assigned. Whether any of these defendants might be considered, by virtue of his office, or his relations to the head of the department, to be exempted from the examination prescribed by law, is a matter to be discussed later. The methods and extent of examination are most amply exhibited in this record, and it very clearly is made to appear that the civil service commissioners have tested the qualifications of applicants in such practical ways, as would reveal what experience, technical equipment, character and reputation they possessed.

It is the claim of the appellants, in effect, that the revised Constitution has not affected the provisions of the civil service statutes, nor has substantially changed the conditions, as to the classification of positions, the determination of the classes and the method of appointment, and that they remain, as before, questions for the sole determination of the administrative officers of the state and city governments. There can be no

doubt that, so far as the existing laws were consistent with the provisions of the Constitution, they were unaffected by them. Only such acts of the legislature as were repugnant to the Constitution were expressly abrogated. (Art. 1, sec. 16.) But the constitutional provision was so radical in its operation that, thenceforth, the rather plenary exercise of discretion, vested by the statute in the administrative officers of government, was taken away. There was no longer to be that latitude of discretion, which was afforded by such provisions, as that the regulations should be such " as may best promote the efficiency thereof," or " as nearly as the conditions of good administration will warrant." The constitutional convention and the people, who adopted their work of revision, had in mind a more stringent principle in appointing persons to perform duties affecting the public interests. Thenceforth, appointments should be upon the basis of a fitness for office; to be solely tested, when it was practicable to do so, by examinations, which should be competitive in their nature, if that, too, was practicable. It was not proposed that the benefits, which they believed would result from the strict application of such a principle, should be lost, or diminished, by the exercise of a merely formal judgment, or of an arbitrary legislative discretion.

We have recently had occasion to consider the effect of this constitutional provision, in depriving the legislature of any purely arbitrary power of determination as to what places it was practicable to fill by appointment without competition. The *Keymer Case*, (148 N. Y. 219), arose under chapter 344 of the Laws of 1895, which amended the Civil Service Act so as to create an exemption in favor of the veterans therein described from competitive examinations. The language used was that " competitive examinations shall not be deemed practicable or necessary " in such a case. We held the act to be unconstitutional; because it referred only to veterans of the civil war and created a favored class, and because it arbitrarily declared as to them competitive examinations should not be deemed practicable, in cases where the compensation does not

exceed four dollars per day. Judge BARTLETT, delivering the opinion of this court, observed, that " while it is true that the Constitution contemplates that it may not always be practicable to ascertain merit and fitness by examinations, or to have these examinations competitive, yet a mere arbitrary declaration in an act of the legislature that competitive examinations of veterans are impracticable in cases where the compensation does not exceed four dollars· per day, is in plain violation of the provisions of the Constitution making competitive examinations necessary."

The use of the word " practicable " in the section has been seized upon as the basis for an argument, by implication, that it was recognized that it might not always be possible to test merits and fitness, in every instance, by an examination, competitive or non-competitive, and, as existing laws were left in force, so far as not repugnant to the Constitution, that all questions of classification, and of matters of appointment thereunder, are left to the determination of the mayors, as provided for by the acts of the legislative body, in whom such a power of legislation resided. The significance of the terminology of this section is not open to so broad an implication. All exceptions to the rule of examinations were abrogated by the section, which formerly existed by statute, or which became engrafted upon the law by regulations. There were to be no more exemptions from examinations in any case; unless it was one, where, from its peculiar nature, it could be seen that an examination would not be practicable for the purpose. It is not difficult to understand what was intended; however difficult it might be to furnish a definition which would include the cases where examinations would not be practicable. Such cases might be found in the selection of a private secretary, where the statute gave the power to appoint such; or in the selection of an attendant or clerk by a judicial, or executive, officer, where there was a similar power to make the appointment. In such and like cases, the requirements for the place might consist, rather in the capacity of the person to inspire and to deserve personal confidence and a

personal liking, than in the possession of experience, or knowledge, or a technical equipment. Such might well be the case, where the executive officer is charged with such responsibility, in the performance of the duties of his office, as to require him to rest upon the vigilance, integrity and personal faithfulness of a clerk; qualities which examinations might insufficiently display, if at all. So, with respect to competitive examinations, cases can be conceived of where they might not be practicable; whether simply from the absence of any competitors, or, more pertinently, where the nature of the work to be performed by the applicant is such that an examination in competition with others would not aid in determining his fitness for the particular position to be filled. It would not be profitable for us to attempt any elaborate definition. As cases arise, where it is sought to apply the exception to examinations, competitive or non-competitive, upon the ground of the impracticability contemplated by the section, they will have to be passed upon by the courts. The question is necessarily a judicial one. Whether, in a given case, a competitive examination is practicable to ascertain the merits and fitness of the applicant for the place, is mainly a question of legal construction; which is to be determined by reference to the requirements of the office and by the use of judgment, aided by the facts of the case. Whether a classification, or a determination made as to the method of appointment, is in conflict with the constitutional provision, or is in evasion of its spirit and purpose, must be a question for the ultimate decision of the courts.

There should be no ground for the fear, suggested by the appellants' counsel, of an undue interference by the courts with the exercise of discretionary powers vested by law in the administrative departments of government. The exercise in good faith of administrative judgment, resting upon facts and circumstances, which leave the question of the practicability of an appointment upon the examination test prescribed, a fairly debatable one, should not and will not be disturbed. Nor is

there any inclination to intrude upon the sphere of any legislative action, when, in the enactment of the laws called for by the constitutional provision, or deemed requisite in some exigency, it shall undertake to classify, or to declare with respect to the practicability of competitive examinations in a class of cases; provided that its action is in the exercise of a reasonable discretion and not open to the charge of intending a violation of the fundamental law. As it was observed in the *Keymer Case* (*supra*), with respect to the possibility of offices and positions arising, which, in the light of experience, could not be filled by competition, "it will be competent for the legislature to provide for it by an appropriate act, disclosing the circumstances which justify its intervention." The power of the courts is rather supervisory in its nature and it is intended that it shall be invoked, whenever the charge is made that the constitutional guarantees have been infringed upon by legislation. The duty of the court is in no wise to classify, but to pass upon a question of classification, in view of the requirements of the Constitution.

The question of the extent to which the constitutional provision is self-executing is to be answered from a reasonable survey of the whole section. It is sweeping in its provision as to all existing exceptions or exemptions. Veterans were to pass examinations, although accorded a preference in appointment and promotion upon the lists, and appointments in the department of public works of the state, theretofore without the operation of the Civil Service Law, were brought within its provisions. As it was held in the *McClelland Case* (148 N. Y. 360), the result of requiring the general application of the Civil Service Act has been " effectually accomplished by the adoption of the new provision in the fundamental law." As previously pointed out, the Constitution provided for the continuance in force of all legislative acts, not repugnant to it, and when the revisers inserted in the section a provision that laws shall be made to provide for its enforcement, they understood that, while there were laws in existence, which applied to the civil service in the state and in the cities, and

which provided for the appointment of commissions and the promulgation of regulations, etc., there were none which were applicable to the villages or other civil subdivisions of the state. The propriety of such legislation, as would enable the constitutional command to be complied with everywhere, was obvious. The purpose of the direction in the section to make laws, therefore, was to make it possible that throughout the length and breadth of the civil service in this state, there might be a complete obedience to the command, through an authoritative and intelligent adaptation of the law to the conditions of the various localities. It became, and it is, the duty of the legislature to enact such a law, or laws, as would secure to the people of the state, in all its civil divisions, the benefits of a compliance with the constitutional provision. The failure of the legislature to do so should be attributed to a misapprehension of the situation, introduced by the adoption of the revised Constitution, rather than to any intention to disregard the duty imposed upon it. Until such legislation is had with respect to the counties, towns and villages of the state, that positions are classified and that commissions, or boards of examiners, and all necessary machinery are authorized and provided for, the amendment of the Constitution may remain ineffectual. In the opinion in the *McClelland* case, it was remarked that " it was the intention to put all the new provisions of the Constitution into operation through the instrumentality of such laws as were then in force, so far as practicable, and if, in practice, they were found to be in any respect insufficient for that purpose, they were to be replaced or supplemented by new ones."

That the section is self-executing, I do not think we can deny and, indeed, we so held in the *McClelland* case ; but in the reasonable sense. Legislation was only needed in order to guide appointing officers and to furnish them with proper authority and rules to perform their duty under the law. I think it does not impair the operative force of the constitutional prohibition, that it may be, in part, ineffectual, until the revision of present laws, or the enactment of new ones, shall

prescribe a classification · of positions, or the mode in which the constitutional provision should be complied with.

Nor does this view work so harshly upon executive officers, or upon their appointees, as to avoid the appointments *ab initio* and to subject the former to some personal liability, or the latter to the loss of their compensation for services actually performed. In the absence of bad faith, fraud, or collusion, appointments made under existing civil service regulations should not subject the appointing officers personally to liability for the salaries paid, if it be determined that the appointments have been illegally made. The discretion exercised by the mayors in assigning positions to non-competitive schedules may have been mistakenly and erroneously exercised; but, until it has been declared judicially that those positions were, within the purview of the Constitution, such as it was practicable to fill by appointment from lists of persons who had successfully passed the required examinations, the appointments stand and the incumbents of the offices are entitled to be paid their salaries or compensation. The constitutional provision must be humanly viewed. It recognizes that examinations may not always be practicable to test the qualifications of applicants for public office, and a classification, containing a non-competitive schedule, or a determination upon the method of a non-competitive appointment, made in good faith, will not be presumed to have been in disregard of the constitutional requirements. Remedies by action are afforded, to test the legality of the method of appointments to office and to secure a judicial revision of the subject of complaint. I am of the opinion, therefore, that the defendant appointees are entitled to the salaries or compensation earned by them, until by a final and conclusive judgment the legality of the mayor's classification has been determined upon.

Finally, upon the question of the positions held by the defendant appointees, I am unable to find any ground for holding that competitive examinations were not perfectly practicable to test their merits and fitness. Their positions

cannot be said to be of a character which makes examinations impracticable, as a mode of ascertaining the fitness of applicants. In almost all of the positions in the civil service, confidence must be reposed in the appointee and his honesty is an important prerequisite, and, if the practicability of competitive examinations were made to depend upon such considerations merely, it would go far to emasculate the vigor of the reform intended to be effected by the constitutional amendment. The disposition should not be to be too liberal in the construction of the term "practicable," when applied to competitive examinations. The desire of the people for the efficient services of persons, selected for their competency to perform them, should not be thwarted by refining away the language, in which that desire has been expressed. The dominant idea was that public servants should be competent for their positions. They have solemnly decided that subordinate public offices in the departments of the civil service should not be filled by appointments, made as mere rewards to political or personal adherents, but upon the sole basis of ascertained merits and fitness. It will not suffice, to avoid its applicability to some positions, that it requires the repose of some trust in the appointee. This is not the true significance of the language of the section. It is perfectly practicable to ascertain the fitness of a person to be trusted in a clerical or other subordinate position in a department through the methods of the examinations provided for by the regulations. The service is a public one and rarely confidential as in the case of private employment. This very voluminous record, among other matters exhibited to illustrate the workings and merits of the civil service rules, contains exhibits of actual competitive examinations held for applicants for positions in the different grades of the city's service, with the method of marking, and that they are practical in their character and relate to matters which fairly test relative capacity and fitness to discharge the duties of the office applied for, I do not think can justly be denied. I do not see why every one of the positions described in this action could not be filled, to the

better satisfaction of the executive head and the public, upon competitive examinations. That moneys will be handled is no adequate reason for exemption. As before said, it should actually appear that an examination, competitive or non-competitive, could not fully satisfy the peculiar, or personal, requirements of the position to be filled, in order that it may be held to come within the purview of the Constitution as one which might be appointed to by a mere personal selection. None of the defendants can be fairly said to be filling such a position.

No other questions demand a continuance of this discussion, the length of which is only justified by the importance of the questions, which have been argued with exceptional thoroughness and ability by both counsel. Generally stated, the conclusions I have reached, are that section 9 of article V of the new Constitution operated to modify the civil service laws and regulations, which were existing on January 1, 1895, and to establish as the sole rule for appointments to subordinate positions in the civil service an ascertained merit and fitness in the applicant, upon competitive examination; that its effect was to abrogate all exemptions and exceptions to the rule, unless in some case where such examinations were impracticable as a method of appointment; that the provision executed itself in the public service of the State and of the cities, but needed legislation in other civil subdivisions to govern the conduct of appointing officials and to regulate compliance by them; that, in a case arising upon the legality of a classification, or assignment, of a position in a non-competitive schedule, the question becomes a judicial one and is for the revision of the courts, upon the facts as found and in the light of a common experience and a common knowledge; that until a final and conclusive judgment is had, which determines the illegality of appointments, the appointees in office are entitled to be paid their salaries or compensation; and, finally, that competitive examinations were practicable, in the constitutional purview, for all the positions filled by the defendants.

I think that the judgment should be modified so as to conform to this opinion and, as so modified, it should be affirmed.

O'BRIEN, J. (dissenting). I concur in many of the general conclusions of Judge GRAY with respect to the questions involved in this case. But since I have arrived at the conclusion that the judgment appealed from is right in its entire scope and meaning, I prefer to state, in as brief language as possible, the grounds upon which it is based. Many of the questions discussed at the argument and upon the briefs of counsel have long been settled, and have been so clearly removed from the domain of doubt or discussion that a bare statement of the principle is sufficient.

The right of a taxpayer to maintain such an action is no longer an open question. The statute gives the right in express words, and this court, in at least two cases, and upon facts substantially identical with those appearing in this record, has sustained the right. (*Rogers* v. *City of Buffalo*, 123 N. Y. 173; *Peck* v. *Belknap*, 130 N. Y. 394.)

We have recently sustained the right of a taxpayer to maintain an action to restrain the common council of a city from proceeding to appoint police commissioners under a law claimed to be in violation of the Constitution. (*Rathbone* v. *Wirth*, 150 N. Y. 459.) This is an action to restrain the payment of salaries to persons appointed in the civil service of the city, as it is alleged, in violation of the same instrument. That was an action to restrain the municipal authorities from making the appointments for similar reasons. No substantial distinction can be made between the two cases, and if it was ever desirable to limit the right to bring actions of this character by refining away the statute, it is too late now. There is nothing in this case to warrant the court in reviewing its former decisions on this subject, much less in reversing them.

Nor is the right to maintain the action affected by the fact that the alleged illegal act may be reviewed or corrected in some other way. Such a rule would practically repeal the statute, since many of the official acts of public officers are

subject to such review    The taxpayers' action is an additional remedy in equity, and exists quite independent of all other methods for testing the question whether the proceedings or the official acts in any given case are or are not illegal.

The controversy in this case depends upon the meaning, scope and application of a new provision which has been inserted in the Constitution : " Appointments and promotions in the civil service of the state, and of all the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive;   *   *   *   Laws shall be made to provide for the enforcement of this section."   (Art. 5, § 9.)

No one can deny that this provision of the Constitution is a limitation upon the power of appointment to places in the civil service. It is not a mere authority to the legislature to create a limitation. It is a limitation in itself, and by its own force affects not only the power of the legislature over the subject, but that of every public officer in the state who has been intrusted with the power to make appointments. All such officers who, since the first day of January, 1895, have taken the oath to support the Constitution, have virtually sworn that they would make no appointments in the civil service except according to merit and fitness, to be ascertained, so far as practicable, by competitive examinations. The argument of the learned corporation counsel, as I understand it, is to the effect that until the legislature shall make further regulations on the subject, it is impossible to carry out the pledge involved in such an oath. Since it will be necessary to refer to this subject hereafter we need not now stop to inquire how far it is true in fact that public officers are confronted by such a dilemma.

The scope, meaning and intent of every constitutional limitation upon power must, in the end, present a judicial question. Administrative or ministerial officers, who have to deal with the limitation in the performance of their duties, are bound to decide all questions that may arise as to its application

according to the best lights that they may have. They must discharge all the obligations imposed by conscience and their oaths according to the best of their ability. But when their acts are questioned, as they are in this case, they must be brought to the test of the Constitution through judicial action. The governor, the legislature, the mayor of a city, and other officers exercising like powers, must frequently determine for themselves the meaning of the Constitution, but when it is alleged that any such determination is erroneous, the dispute must be finally settled by this court.

That is the precise character of the controversy presented by this record. The comptroller and other executive officers of Brooklyn have filled eleven designated places in the civil service of that city since the Constitution went into effect without any examination whatever to test the merit or fitness of the appointees. If they have made these appointments with regard to merit or fitness, then, obviously, they must have ascertained these qualities in the appointees in some other way, or by some other method, than that which is clearly pointed out in the Constitution. The validity of these official acts is challenged by the citizens of Brooklyn who pay taxes and who are authorized to bring all such acts to the test of the law and the Constitution by an appropriate action.

That it was practicable within the meaning of the Constitution to ascertain the merit and fitness of these eleven persons by competitive examinations, is not, I think, now an open question. It was found unanimously by the court below that such examinations were practicable, and even if the question could be regarded as an original one here there could be no doubt about it from the nature of the duties to be performed. There was a stamp clerk and a clerk to the board of aldermen, a dockmaster and an assistant warrant clerk, a collector of license fees in the fire department and a surveyor of land in the department of assessments, a clerk in the license bureau and another in the department of audit, what is called a secretary to the department of buildings, with duties purely clerical, and a clerk in the law department, and, finally, a finance clerk in the

49

health department.  It appears that his duties are to make searches in the department for the records of marriages, births and deaths, and to receive and pay over to the city the fees therefor, which amount in the whole year to about $158 per month.

The title which is given to this appointee does not describe his duties, which are of the most routine character.  They cannot by any effort of the imagination or any refinement of reasoning be made to bring the place within any exception to the general rule of competitive examination.  The duties of such clerks or agents are not involved in any doubt or mystery. They are matters of common knowledge, and it would be impossible for any court to assign any satisfactory reason why such places cannot be filled by the appointing power according to the scheme of the Constitution.

But the plaintiffs at the trial did not rest the case upon the right of the court to take judicial notice of the duties of the several appointees.  They gave a mass of testimony derived from various sources tending to show that it was practicable to fill all the places by competitive examination.  The defendants gave none, and, so far as this question depends upon facts, the proof on the part of the plaintiffs was uncontradicted.

Six judges of the Supreme Court have determined unanimously that it was practicable to fill all these places by competitive examinations.  In my opinion this court has no right to review the decision upon this question.  Whether it is practicable to do a certain thing in a certain way must in some measure at least depend upon facts and circumstances that may be the subject of inquiry at the trial.  The question, when determined there and affirmed by the Appellate Division, should be regarded in this court as settled for all the purposes of the case.  The jurisdiction of this court is confined to questions of law, and whether it is practicable to fill a given place in the public service by competitive examination is not a pure question of law.  It may in many cases require proof as to the nature of the duties to be performed, and when the proof is given it is for the trial court to pass upon it,

and the finding is conclusive upon this court. It seems to me that even before the provisions of the present Constitution went into effect that we would be bound to follow the findings of the courts below on this question. In the face of the findings of the courts below, that it was practicable to fill the places in question by competitive examinations, the learned corporation counsel does not attempt to show that it was not. His position is that the appointing power had authority to decide that it was not practicable to fill the places by competitive examinations, and that, having so decided, the courts have nothing further to do with the question. The soundness of this proposition will be considered hereafter, but enough has been said to show that this court is not concerned with any question with respect to the practicability of filling all these places according to merit and fitness, to be ascertained by competitive examinations. That question may be regarded as settled, so far as this case is concerned, by the judgment of the courts below.

When the Constitution went into effect on the first day of January, 1895, it became, with respect to all appointments and promotions in the civil service of the state or in any city, the supreme law of the land, anything in any statutes, rules or regulations to the contrary notwithstanding. In so far as the statutes, rules and regulations upon the subject of admissions to the civil service were not repugnant to the Constitution, they undoubtedly remain in force, but in so far as they were inconsistent with or repugnant to it, or in any respect tended to defeat, obstruct or evade the plain mandate which it contained, they were swept away and immediately ceased to exist. The mandate of the Constitution was that thereafter a certain thing should be done in a certain way if it was practicable to do it in that way, and it was not only an affirmative command to do the thing in that way, but a negative prohibition against doing it in any other way. (*People* v. *Draper*, 15 N. Y. 544; *Rathbone* v. *Wirth*, 150 N. Y. 468.) If the Constitution did not contain within itself, or with the existing laws which it preserved, all the means for the execution of the affirmative

mandate in the way prescribed, it certainly was potent enough in its negative or prohibitory injunction to forbid and prevent the doing of the thing in any other way. Any constitutional provision is self-executing to this extent, that everything done in violation of it is void. (Cooley's Const. Lim. [5th ed.] 100; *Law* v. *People*, 87 Ill. 385.) If it be true that the defendants had not been furnished by the legislature with the necessary machinery for making appointments in the manner prescribed by the Constitution, then the result would be that they could not make them at all.

We have, therefore, a case before us where the Constitution commands that appointments shall be made only after competitive examinations, when such examinations are practicable. We have the question settled that it was practicable to fill the places by competitive examinations, and we have the conceded fact that the appointments were made without any examinations whatever. The vital issue between the parties to this action is whether these appointments were legal or illegal, whether made in violation of law or in conformity with law. I have thus far confined the discussion to certain propositions that are either admitted or not seriously contested. Most, if not all of them, are so plain as to be self-evident. If they are not then they are, as it seems to me, so strongly entrenched in reason and in law that they cannot be weakened by argument or entangled by sophistry. They lead logically and inevitably to the conclusion that the appointments in question were illegally made, and but for the elaborate argument of the learned corporation counsel to prove that they were made in accordance with the Constitution and the law the discussion might end here.

That argument deserves a fair analysis, though it is quite difficult to summarize it accurately. It would not be fair to approach the argument in justification of these appointments in any narrow, captious or fault-finding spirit. We are not much concerned with individuals, and we can look at their acts and conduct with the broadest charity. We are dealing with principles and not men. We are concerned with the Consti-

tution and the laws in their relation to the civil service of a
great state, and in the great cities of that state. The future of
the law which now rests upon the basis of the Constitution is
dependent upon the decision of this court. The decision in
this case will either place the reform upon a reasonable and
just basis, and command the approval of all good men, or it
will be a step backward.

We cannot allow this case to turn upon any smaller ques-
tion than the true intent and meaning of the Constitution.
If the intent and meaning be what the corporation counsel
claims then there is no case against the officers who have been
made defendants, but if, on the contrary, the Constitution has
been ignored in making the appointments, we ought to declare
the fact, no matter who is affected by the result.

The argument of the learned corporation counsel may be
summarized as follows:

(1) The Constitution has neither enlarged the duties nor
abridged the powers of public officers making appointments in
the civil service of the state or of any city. The Constitu-
tion was simply intended to preserve the statute and it means
just what the statute meant and no more.

(2) These appointments were made in conformity with the
statute and rules regulating admissions to the civil service in
force prior to January 1, 1895. That the rules under which
they were made were then in force and are still in force, not
having been affected by the adoption of the Constitution.

(3) That the mayor of Brooklyn was authorized to deter-
mine and has determined that it was not practicable to fill any
of these eleven places by competitive examinations; and that
such determination protects the defendants and all their
appointees and is binding upon the courts.

(4) That all questions with respect to such appointments
are purely administrative within the power and discretion of
the appointing power, whose decision is final and not subject
to be questioned in an action by a taxpayer.

These propositions are slightly softened or modified in the
course of the argument by certain exceptions, and these excep-

tions will be noticed hereafter, but it is believed that this is a
fair outline of the argument, though perhaps expressed in
different form of words. It will be convenient here to briefly
notice the third proposition since it is based upon matters of
fact. There is nothing in the record to show that any mayor
of Brooklyn ever made any decision that these eleven places,
or any of them, could not be filled by competitive examina-
tions, or that it was not practicable to do so. There is nothing
to show that any such question was ever considered or passed
upon. It does appear that all these places were put into
the non-competitive schedule from time to time by the mayor,
two of them having been placed there since the present Con-
stitution went into effect. So far as appears the only reason
for this was the request of the heads of departments. It is
a singular fact that no mayor has ventured to assert, either
as a witness in this case, or in any other way, that even one of
these places was placed in that schedule for the reason that it
was decided to be impracticable to fill the place by compet-
itive examination. The corporation counsel is thus compelled
to stand upon the narrow and, as it seems to me, untenable
ground that the mere designation of these places in the non-
competitive schedule, for any reason or for no reason, neces-
sarily and conclusively imports a determination by the proper
authority that it was not practicable to fill the places by com-
petitive examinations. This, of course, would make every
arbitrary addition to that schedule conclusive, a proposition
that seems to me to be impossible to defend in reason or law.

The non-competitive schedule plays such an important part
in this controversy, and indeed must play such an important
part in the administration of every civil service law, that the
questions in dispute cannot be fairly treated or clearly under-
stood without an accurate knowledge of the origin, growth
and real meaning of that schedule. Before the Constitution
was adopted, and under the statute and rules, the administra-
tion of the law in the state was left largely with the governor,
and in cities with the mayor. They could exercise what may
well be called the dispensing power, that is, the power to say

whether the law and the rules should apply to a particular case. Applications were constantly made to them to take some particular place out of the operation of the law, and it is known that these applications were seldom refused when pressed by the head of some department, and so the non-competitive schedule became the repository of executive favors. It was not necessary to determine, and in fact scarcely ever was determined, that it was not practicable to fill the place by competitive examinations. They could exempt the place for various reasons at discretion or without any reason. This resulted from the vague language of the statute which did not, as the Constitution now does, unqualifiedly limit such special exceptions to cases where it is not practicable to fill the place by competitive examination.

The places were to be filled by examinations "as nearly as the conditions of good administration will warrant." The mayor was to make regulations for the admission of persons to the civil service of the city upon the principle of competitive examinations "as may best promote the efficiency thereof." These vague and ill-defined exceptions and limitations did not confine the appointing power to the question of practicability, as the Constitution now does. It is true that the word is used in the statute, but only in connection with the vague discretionary provisions above referred to. The result was, as might well have been expected, that there was constant complaint that the power to dispense with the operation of the law was frequently abused. Such vague powers always have been and always will be abused. The dispensing power was the prolific source of irritation between the government and the people in England for centuries, and we know what the result was in the end. When the original regulations were made by Mayor Low, in 1884, there were only five of the places in question placed in that favored schedule. The other six have been added since 1894. The exemption of the five places in the original schedule was not made because it was impracticable to fill them from the eligible list, but on grounds of policy and expediency, which constrained a cautious executive

to avoid attempting too much with. a new and untried law which he had reason to believe was not popular with all classes. The other six places were dropped into the schedule since 1894 at the request of the heads of the departments.

So it is plain that this schedule, at the time these appointments were made, had little, if any, relation to the question of practicability. It represented many other things and was based upon many other reasons.

It represented a liberal exercise by the mayor of his dispensing power, based simply upon the wishes of heads of departments. They frequently found the law an obstacle in the way of discharging obligations which were supposed to be due to personal or political friends, and often succeeded in persuading the executive to relieve them from its trammels, and the non-competitive schedule was the favorite device for this purpose.

Thus, by the exercise of the discretion conferred by the statutes upon the executive to dispense with the law in special cases, all the evils which the statute was intended to suppress grew and flourished under it until the method of administration become a reproach to all concerned, and the law itself was in danger of falling into contempt with the people. The convention to amend the Constitution was regarded by the friends of the law as a favorable opportunity to rescue it from the scandal connected with administration which originated in the exercise of discretionary power, and they seized upon it and the result was that the principle was embodied in the Constitution in language that is not to be mistaken. It was precisely the abuses to which I have referred, and especially the evasions which had theretofore existed through the operation of the non-competitive schedule, that were intended to be swept away by the Constitution. Nothing can be clearer than that there was present to the minds of the members of the convention the abuses in the administration of the law which have been referred to. The amendment was evidently drawn by the friends of the reform, and the convention was called upon to adopt or reject it. The former course was

decided to be the best, and, under these circumstances, what this or that member said upon the subject, or the interpretation that he put upon the language of the amendment, is of little consequence. The obvious effect of the Constitution was to remove the eleven places in question from the non-competitive schedule since it was practicable to fill them all by competitive examinations.

It should also be noted that the placing of these positions in that schedule was in the nature of a privilege or a favor to the appointing officer. He was not obliged to accept the privilege or act upon the dispensation. He could still fill the place, if he wanted to, from the eligible list made up as the result of competitive examinations. He could still act upon the general rule, which was competition, and refuse to avail himself of the right to dispense with the law. A place that may be filled without an examination may also be filled at the election of the appointing officer by the appointment of a person whose merit and fitness for the place have been ascertained by competitive examination. Even in cases where the constitutional test may be dispensed with, the fact that the candidate has passed the test can never disqualify him for any appointment.

The learned corporation counsel argues that the defendants could not have made these appointments in any other way. In this he is clearly mistaken, since, when the non-competitive schedule was abrogated by the Constitution, they had the eligible list to fall back upon and could have selected every one of the appointees from that list. Had they taken that course, they would now stand upon solid ground and would be armed with the weapons for a complete answer and defense to all such actions as this. The claim that the mandate of the Constitution could not be obeyed, when the appointing power had all the time at hand the eligible list to select from, cannot for a moment be entertained. Even if it were true that these appointments could not have been made under the Constitution, the worst that could happen would be, not to make them

at all. The defendants found the places all filled by persons, many of whom had served for years, and, even if the Constitution had tied their hands and left them without the power to change a stamp clerk or a custodian of the records of marriages, birth sand deaths, there is nothing in the record to show that this would have been any great calamity.

But we have seen that, in so far as the non-competitive schedule had been abrogated by the Constitution, the competitive schedule and eligible list took its place, and there was not the slightest difficulty in making the appointments from them. The eleven names in question were not found on any list. The places had been thrown into the non-competitive schedule, and the defendants, in the belief, no doubt, that the old state of things continued, selected the appointees according to their own will.

The learned corporation counsel has made one important exception to his fundamental proposition that the power of the mayor to dispense with examinations in special cases still exists. He admits that the privileges of veterans have been abolished. This court has so decided, and also that the legislature has no power to dispense with the law in cases where the compensation does not exceed $4 per day. (*Keymer Case,* 148 N. Y. 219; *Sweeley Case,* 12 Misc. Rep. 174; 146 N. Y. 401.) This is a significant admission. If the legislature had no power to exempt veterans, and had no power to make the test of practicability depend on compensation, what became of those numerous exemptions from all examinations made from time to time by the mayor, not only before but after the Constitution went into effect, where examinations were practicable? What good reason is there for the contention that, while the former have been abrogated or invalidated by the Constitution, the latter remain in full force? The Constitution has left but one exception to the general rule, and that is a case where it is not practicable to fill the place by competitive examination. It is not enough that the legislature, or some administrative officer, has declared that it is not practicable in a given case. It must appear, when all the reasons and circumstances are

known, to be in fact impracticable, and, while that question may be decided by the appointing power in the first instance, yet in all cases of dispute, it must be decided by the courts.

The fatal weakness in the argument of the learned corporation counsel is found in the assumption that not only all assignments made by the mayor to the non-competitive schedule prior to the adoption of the Constitution on January 1, 1895, remained in force, but that after that date he had the power to continue to make such assignments, with or without reason, and without regard to the question whether examinations were practicable or not. In other words, the claim is made that the dispensing power has not been affected by the Constitution. This position is plainly untenable. Every assignment to that schedule made before the Constitution took effect, in which it was practicable to fill the place by competitive examination, has been abrogated, and every assignment of a like character since made is void since they are in conflict with the Constitution.

When the appointments were made they were all by force of the Constitution in the competitive schedule, which in fact and in terms covered every one of the places, and the appointees should have been selected from the eligible list.

The question whether the Constitution is self-executing is not a practical one in this case. The question is whether, by its own force and by force of all the civil service laws and regulations which are behind it and are preserved by it, these eleven appointments should not have been made from the eligible list. The Constitution found and left a complete system of statute law in force which was ample to enable every appointing officer to execute its mandate, and it extended the civil service principle to all the civil divisions of the state, including villages. It is said that since counties and villages have no adequate means of putting the constitutional provision in force, it cannot be self-executing, but must await legislation.

This is undoubtedly the most favorable situation that can be selected to enforce the argument that the Constitution is

dependent upon legislation. It has been said that a constitutional provision is self-executing if it supplies a sufficient rule, by means of which the right given may be enjoyed and protected or the duty imposed may be enforced. (Cooley's Const. Lim. 100.)

While we are not concerned in this case with appointments in villages or counties, it would not be difficult to show that there is not a village or county in the state in which the mandate of the Constitution cannot be complied with to-day without further legislation. It is only necessary that the appointing authority should be in harmony with the law and absolutely bound to obey it and respect his official oath. If he is zealous to comply with the Constitution all difficulties will immediately vanish. Let him but announce to the public that he will make no appointments to office except according to merit and fitness, to be ascertained by competitive examinations, and he will not fail to find candidates at hand who have complied with the test. The state civil service examinations are held periodically in every locality of the state, and from that source he can obtain an abundant supply of qualified candidates for every place that he may desire to fill. It is not necessary in order to put the mandate of the Constitution into immediate operation to wait until a village or a county civil service board is organized by the legislature. All the Constitution requires is that there shall be an honest, open, competitive examination, and the state can furnish that even to candidates in the particular county better than any local authority.

A village or county civil service board would be likely to be or become a weak, inefficient thing, while the state has every facility for placing at the door of the appointing officer all the machinery necessary to enable him to execute the mandate of the Constitution. Any county clerk or other county officer who has appointments to make, and who earnestly desires to comply with the Constitution, will find no difficulty in accomplishing his purpose. The legislature has undoubted power of regulation, and doubtless there may be cases where it should be exercised, but the broad assertion

that the Constitution must remain a dead letter until the legislature moves cannot be sustained by any sound argument.

One of the main purposes of the Constitution, and of every civil service law or regulation, is to produce an honest, eligible list. When the appointing power has full and free access to that there can be no difficulty in complying with the letter and spirit of the Constitution. Even before the constitutional provision went into effect competitive examinations were the rule of the civil service, and no examinations whatever the exception. These exceptions have been abolished, and the Constitution has put it out of the power of the legislature, or of any executive officer, to make a new exception, or to maintain an old exception to the general rule that competition shall prevail, unless shown, as matter of fact, to be impracticable. That is the only condition upon which the Constitution will permit any deviation from the law, and since, in every view of this case, that condition did not exist, the appointments in question were in violation of the commands of the Constitution.

There is, it seems to me, a strange discord between the doctrines of the prevailing opinion in this case and the former utterances of this court on the same questions. The keynote of that opinion is that the classification of the governor or the mayor, though in conflict with the Constitution and the statute, is, nevertheless, good, and protects all executive officers and appointees until set aside. If this proposition is sound, then it follows that the mayor may place all appointments in the non-competitive schedule and thus abolish all examinations, and no one can complain till the classification itself is attacked by some proceeding to set it aside. We are not told how or by whom this executive act, abolishing examinations, may be set aside, though mandamus or certiorari are both hinted at as remedies.

The classification in this case was made about thirteen years ago, and it is too plain for argument that mandamus will not lie to compel the mayor to change it or to make it in some other way. It is elementary law that, while mandamus will lie to compel a public officer to act who refuses to move at all, it will not lie to compel him to act in some particular way.

An erroneous classification, once made, cannot be corrected by mandamus, so, the suggestion of any relief from such a source may be dismissed. (*People ex rel. Eq. L. A. Soc.* v. *Chapin*, 103 N. Y. 635; *People ex rel. Millard* v. *Chapin*, 104 N. Y. 96; *People ex rel. Demarest* v. *Fairchild*, 67 N. Y. 334.)

It is equally clear that certiorari will not lie. That writ must be brought within four months from the time of the classification, and, therefore, the right of review in that form expired more than twelve years ago, if it ever existed. (Code, § 2125.)

But it is obvious that the right to review by means of that writ does not exist at all, and never did exist. The writ of certiorari is now governed and regulated by section twenty-one hundred and twenty, chapter sixteen, article seven, of the Code, and it is only necessary to read the statute in order to see that it has no application to the acts of the governor or mayor under the civil service law. Official acts that are executive, legislative or administrative in their nature and character were never subject to review by certiorari. That a classification made by the executive under the civil service law is such an act, and, therefore, not subject to such review, is indisputable. (*People ex rel. Copcutt* v. *Board of Health*, 140 N. Y. 1; *People ex rel. Vil. of Jamaica* v. *Supervisors*, 131 N. Y. 468; *People ex rel. S. A. R. R. Co.* v. *Park Commissioners*, 97 N. Y. 37; *People ex rel. Corwin* v. *Walter*, 68 N. Y. 403; *People ex rel. S. & U. H. R. R. Co.* v. *Betts*, 55 N. Y. 600.)

Indeed, the decision, when followed to all its logical consequences, practically abrogates both the Constitution and the statute, since it makes the will of the executive the supreme law.

It is certainly a radically new departure in this class of actions to turn the plaintiffs out of court who, as taxpayers, are seeking to restrain the operation of official acts, conceded to be illegal, upon the theory that they should have resorted to such fanciful and impossible remedies.

The judgment should be affirmed.

BARTLETT, MARTIN and VANN, JJ., concur with HAIGHT, J., for reversal; GRAY, J., reads for modification, and ANDREWS, Ch. J., concurs; O'BRIEN, J., reads for affirmance.

Judgment reversed and complaint dismissed.