THE PEOPLE OF THE STATE OF NEW YORK ex rel. JOHN W. TERRY, Appellant, *v.* JOHN W. KELLER, Commissioner of Public Charities for the Boroughs of Manhattan and the Bronx, Respondent.

CIVIL SERVICE — NEW YORK CITY — REMOVAL WITHOUT NOTICE. The relator in an application for a writ of mandamus to reinstate him in the position of superintendent of the almshouse in the city of New York held the position on January 1, 1898, when the Greater New York charter went into effect, and was transferred to the employ of the new city. The position was classified as competitive by the city civil service regulations then in force, but under the regulations of the new city civil service commissioners which went into effect March 5, 1898, it was classified as noncompetitive. On March 31, 1898, chapter 186 of the Laws of 1898 went into effect, which amended the general Civil Service Act of 1883 by changing the manner in which city regulations should be adopted and put in force, and by giving persons holding competitive positions the right to notice and to a hearing before removal. On July 1, 1898, the relator was removed, without notice or an opportunity to be heard. *Held,* that the removal was not illegal and that the relator was not entitled to the writ.

*People ex rel. Terry* v. *Keller,* 35 App. Div. 493, affirmed.

(Argued January 10, 1899; decided February 28, 1899.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered December 9, 1898, affirming an order of Special Term denying a motion for a writ of mandamus.

The facts, so far as material, are stated in the opinions.

*Julius H. Mayer* for appellant. The circumstances attendant upon the passage of an act and its relation to other acts should be considered, in order that the intent of the legislature may be obtained. (*People ex rel.* v. *Lyman,* 157 N. Y. 378; *People ex rel.* v. *Roberts,* 148 N. Y. 366; *Chittenden* v. *Wurster,* 152 N. Y. 345; *People ex rel.* v. *Angle,* 109 N. Y. 564; *People ex rel.* v. *Keller,* 31 App. Div. 248.) A general law will not repeal a special law unless the intention of the legislature is manifest. The intention, therefore, is always the test. (Black on Interp. of Laws, § 153; Suth. on Stat. Const. § 159; *Matter of Dobson,* 146 N. Y. 357; *Stack*

v. *City of Brooklyn*, 150 N. Y. 335; *People* v. *Jaehne*, 103 N. Y. 182, 194; *Bowen* v. *Lease*, 5 Hill, 221; *Chamberlain* v. *Chamberlain*, 43 N. Y. 424; *Matter of Henneberger*, 155 N. Y. 420; *Comrs. of Excise* v. *Burtis*, 103 N. Y. 136.) By virtue of article 5, section 9, of the Constitution, appointive places in the civil service of the state are presumptively subject to competitive examination until otherwise declared by legislative action or by classification of civil service regulations. (*People ex rel.* v. *Roberts*, 148 N. Y. 360.) Section 3 of chapter 186 of Laws of 1898 is not inconsistent with any of the charter provisions. (Sedgw. on Const. Law [2d ed.], 209; Potter's Dwarris on Stat. 73, 189, 231; Endlich on Interp. Stat. §§ 43, 107; *Bowen* v. *Lease*, 5 Hill, 221; *Chamberlain* v. *Chamberlain*, 43 N. Y. 424; *Hudler* v. *Golden*, 36 N. Y. 446.) Section 1618 of the charter contains nothing which requires a decision inconsistent with the position of the relator as stated in the foregoing points. (*Mongeon* v. *People*, 55 N. Y. 613.)

*Theodore Connoly* for respondent. The charter provisions as to civil service repealed those of the General Civil Service Law inconsistent therewith so far as regards the city of New York. (*People ex rel.* v. *Waring*, 1 App. Div. 594; 149 N. Y. 621; *People ex rel.* v. *Waring*, 7 App. Div. 247; *People ex rel.* v. *McCartney*, 28 App. Div. 138; *Moriarty* v. *City of Albany*, 8 App. Div. 118; *People ex rel.* v. *Lathrop*, 142 N. Y. 113; *Matter of M. H. Bank*, 153 N. Y. 199; *Ferguson* v. *Ross*, 126 N. Y. 465; *Beekman* v. *T. A. R. R. Co.*, 13 App. Div. 279; 153 N. Y. 144; Suth. on Stat. Const. §§ 157, 159.) General laws, in the absence of clear evidence of such an intent, will not repeal those which are special or local. (Suth. on Stat. Const. §§ 157, 159; *People* v. *Jaehne*, 103 N. Y. 182; *Matter of Evergreens*, 47 N. Y. 216; *Matter of Comrs. Central Park*, 50 N. Y. 497; *People* v. *Quigg*, 59 N. Y. 88; *Whipple* v. *Christian*, 80 N. Y. 523; *McKenna* v. *Edmundstone*, 91 N. Y. 231; *Reynolds* v. *Niagara Falls*, 81 Hun, 356; *Boechat* v. *Brown*, 9 App. Div. 369; *People*

v. *Koenig*, 9 App. Div. 436; *Lewis* v. *City of Syracuse*, 13 App. Div. 587.) Section 1618 of the charter prohibits the application of chapter 186 of the Laws of 1898 to New York city. (*People* v. *England*, 91. Hun, 152; *People ex rel.* v. *N. Y. C. & H. R. R. R. Co.*, 156 N. Y. 570.) Even if respondent's position hereinabove set forth be unsound still relator cannot be reinstated. (*People ex rel.* v. *Keller*, 157 N. Y. 98.) Resort to the debates of a legislature or to the declarations of the members of such a body is only to be had when there is an ambiguity on the face of the statute to be explained. (*Comm.* v. *Churchill*, 2 Met. 118; *State* v. *Brooks*, 4 Conn. 446; *Edger* v. *Randolph Co.*, 70 Ind. 331; Bishop on Written Laws, § 76.)

GRAY, J. The relator applied for a writ of mandamus, commanding the respondent to reinstate him in his former position of superintendent of the almshouse, in the city of New York. The application was denied at the Special Term and the order there entered was affirmed at the Appellate Division of the Supreme Court, in the first department. Prior to January 1st, 1898, the relator had held such a position under the former city government and when the Greater New York charter went into effect on that date, pursuant to the provisions of section 1536, he was transferred to a similar position in the department of public charities of the new city. That position, from January 1st, 1898, to March 5th, 1898, was classified as competitive, pursuant to the civil service regulations of March 4th, 1897. But, under the regulations adopted by the municipal civil service commissioners of the new city, which went into effect on March 5th, 1898, the position was classified, within schedule "A," as not subject to competitive examination. On March 31st, 1898, chapter 186 of the Laws of 1898 went into effect, which amended sections 8 and 13 of the General Civil Service Act of 1883. Those sections as amended changed the manner in which rules and regulations for appointments and promotions in the civil service should be adopted and put in force, and they gave the right to persons

holding positions subject to competitive examination to be heard in explanation before removal from, or reduction in, office. On July 1st, 1898, the relator was removed from office, without notice or an opportunity to be heard.

It is the claim of the relator that the provisions of the amendatory act of 1898 applied to those of the Greater New York charter, which regulated the civil service system in that city, and that, therefore, as the rules and regulations of March 5th had not been approved by the state civil service commission, as required by the act, they were of no effect on and after July 1st, "and either the rules of March 4th, 1897, were again in force, or there were no rules in force in the city of New York." That is the situation which the appellant's counsel, in his brief, defines as existing on July 1st, and he argues that, if the rules of 1897 became again effective, his place was within the competitive class and his removal was, therefore, illegal; or, if there were no rules then in force, that he must be deemed to be a person holding a position subject to competitive examination.

When the *Leet* case, (*People ex rel. Leet* v. *Keller*, 157 N. Y. 90), was decided, the question of the effect of the act of 1898 upon the civil service provisions of the Greater New York charter was discussed in the opinion; but the decision of the case was placed, by a majority of the members of the court, upon the other ground of the opinion, that the act of 1898 was prospective in its operation and recognized to be valid and in force existing city civil service regulations, for the period of time specified in the act as that within which rules and regulations were to be established having the approval of the state board. Leet had been removed from office within that period of time and it followed that his removal was lawful, because effected under regulations at the time valid. It was held that by the act of 1898 a period of time of two months was provided for, within which the mayor of a city was to perform the duty of making regulations and classifications for the civil service system, and that, upon the expiration of that period, the state board had a period of one

month within which to take action upon the rules and regulations promulgated and submitted; so that a period of three months would, or might, elapse, before the new legislation could affect such rules as were then in force.

In the present case, the question is squarely presented for determination, whether the act of 1898 applied to the city of New York and, in respect to the matters therein enacted, affected its charter provisions. Reflection confirms me in the opinion which I entertained and expressed in the *Leet* case and I can add little, if anything, to what was said there, or in the opinions delivered at the Appellate Division. I think that when the Greater New York charter went into effect, on January 1st, 1898, it provided for an elaborate civil service system; which, by reason of its features differing from the system provided for in the general act of 1883 in marked and jurisdictional respects, rendered it special and exclusive. The very enactment of the chapter on civil service in the Greater New York charter seems to prove the legislative intent to have been to make a distinct and local system, and that construction is reinforced by the marked and substantial differences apparent in the legislation. If the city of New York was to remain under the operation of the general act of 1883, it was unnecessary to enact the elaborate provisions for a civil service system in the charter. It seems to me to be perfectly clear that the civil service provisions of the charter constituted a special law, as a part of the system of local administration. When the act of 1898 was passed, there was nothing in its language to suggest an intention on the part of the legislature that it should apply to the city of New York. Its title expresses, as does its first section, the sole purpose to be to amend two of the sections of the act of 1883. In no part of it, is there any reference to the Greater New York charter and the only reasons for making the act applicable must be that the city still continued under the operation of the general act of 1883; or, that a reasonable intendment of the enactment, from the subject-matter, could only be accomplished by giving it an application to the city of New York.

As to the first reason, I need say no more than what has already been said. As to the second reason, it finds no support in the settled rule of law in such cases. Furthermore, it seems to me to be without force; inasmuch as there appears to be a purpose in making the act solely applicable to the other cities of the state. The amendments applied to the other cities some new features, viz.: those which had been inserted in the Greater New York charter, relating to the appointment of commissioners by the mayors of the cities and to the admission of laborers into the civil service system. Section 1618 of the Greater New York charter expressly provides that neither the act, nor any section, nor provision, thereof, should be deemed to be repealed, or amended, by any act of the legislature; unless it be so expressly stated, or the legislative intent to that effect be unmistakable. That provision is in clear accord with the settled law of the state, that a special statute providing for a particular case, or class of cases, is not repealed by a subsequent statute, general in its terms, unless the intention to repeal is manifest from the language; although, in terms, the subsequent statute is broad enough to cover the particular case. The two laws may stand together; the one as a general law of the state, and the other as the law of the particular case. This proposition should be regarded as indisputable and it has the support of numerous cases, not only in this state, but in other states; which are referred to in the opinion in the *Leet* case and in the opinion of the Appellate Division. I am quite unable to find a theory to make the act of 1898 fit the case of the city of New York, which will stand the test of the settled rules of law.

But, upon the view that the act of 1898 does apply to the city of New York, the relator's case will not be aided. If by reason of the failure to establish civil service rules and regulations, approved both by the mayor of the city and by the state board, those existing prior to July 1st had become invalid and of no effect, then there were no rules or regulations in existence and, consequently, there was no classification of positions in the civil service of the city. The rules and regulations of March

5th, 1898, had superseded those which had been established in 1897, and they constituted the only ones regulating the administration of the civil service system. We held in the *Leet* case that the act of 1898 was only prospective in its operation and that, as the regulations of March 5th were validly made under the provisions of the Greater New York charter, they alone applied to appointments and classifications, within the period of the three months prescribed for the promulgation of new regulations under the approval of the state board. What, therefore, was the situation on July 1st, unless that of an absence of any rules or regulations regulating appointments and promotions in the civil service ? The provisions of the act of 1898 were ineffectual of themselves to aid the relator. The classification of his position as in the non-competitive class had not been changed and the act of 1898, *ex proprio vigore*, could not place it in the competitive class. His appointment to office had been made in accordance with a classification, which was valid at the time and that classification remained good. The legislation did not change it. All that it did was to impose a duty upon the mayor, which had not been performed. The utmost that can be claimed for the act is that it operated to protect positions which had been classified as competitive ; but it did not abrogate the regulations which had been made at the time of its passage. To the contrary, it recognized their validity. If its commands with respect to the promulgation of new rules and regulations were not complied with, the courts were open to compel that compliance ; but it is certain that it had no effect, of itself, to classify, or to affect any existing classifications. Therefore, as the relator, at the time of his removal from office, was in a position in the non-competitive class, there was neither rule nor regulation in existence to prevent the exercise of that arbitrary power of removal, which is the usual accompaniment of the power of appointment, and by no construction could the provisions of the act of 1898, amending section 13 of the act of 1883, be made applicable to a position in the non-competitive class.

25

I cannot see how the relator could be regarded as entitled to the writ he demanded, whether we hold that the act of 1898 applied to the city of New York, or not; and, therefore, I think that the order should be affirmed, with costs.

O'BRIEN, J. It is admitted that the facts in this case are, in all respects, identical with the *Leet Case* (157 N. Y. 90), except here the relator was removed on the first of July, 1898, whereas, in the *Leet* case, his removal was on the first of April, 1898.

When the latter case was before this court, I preferred to place the decision upon the second ground stated in Judge GRAY's opinion. With respect to the proposition discussed in the first part of his opinion, namely, that chapter 186 of the Laws of 1898 was not applicable to New York city, I entertained then, and still entertain, very grave doubts. There are considerations and arguments against that view that are very difficult to answer; still, I would, if necessary, be inclined to concur with him rather than to become responsible in any degree for throwing the affairs of a great city into inextricable confusion. To turn out all, or at least a great number, of the persons now engaged in the civil service of the city and to put others in their places, would produce a condition of things somewhat akin to anarchy. It is hardly possible to foresee the consequences that would flow from such a decision. It is entirely safe to say that whatever effect it might have upon the affairs of the city, it would produce a brood of litigations that would trouble the courts for a long time to come. The general proposition that a statute, general in terms, does not repeal, or in any way affect, a local statute embodied in a city charter, is, of course, perfectly correct. That, however, is not so when the language of the general law is such that it can be seen that the legislature intended to repeal or change the local statute ; so that all depends upon the question whether that intention is necessarily expressed in the act in question. If that legislation was not aimed at New York city, it is very difficult to perceive what the purpose of the

legislature was. I yield, however, to the argument of Judge GRAY on that question, for the reasons that I have already stated, but only on the grounds and with the qualifications hereafter stated. It is proper to say, however, that this is not the only ground upon which I am moved to concur in the decision below. There are other grounds that seem to me not only entirely satisfactory, but much clearer and conclusive, and I will proceed to state them in as brief a manner as possible.

It is admitted that on the first of January, 1898, when the new charter of the city of New York went into complete effect, the relator was in the employ of that city as superintendent of the almshouse. That place was then classified by the civil service rules in force as one subject to competitive examination and all the consequences that follow. But on the fifth of March, 1898, new regulations for the civil service were made and approved by the mayor, whereby the place which the relator held was put in the non-competitive class. No one now questions the power of the city authorities to make that classification. They acted within the scope of the authority conferred upon them by the city charter. The classification, therefore, was perfectly legal and effective, and it had the effect of making the relator's position non-competitive.

Now the sole question in this case is, whether the relator's position was in the non-competitive class on the first of July, 1898, when he was removed. If it was, then it is admitted that there was power to discharge him without any trial or hearing. We have seen that by the act of the civil service commission and the mayor, the relator was placed in the non-competitive class on the fifth of March, 1898, preceding his removal. It is, therefore, incumbent upon him now to show that in some way, subsequent to that date and prior to the first day of July, he was taken out of the non-competitive class and placed in the competitive class, since, unless it can be shown that he was in the competitive class at the time of his removal, the decision of the court below was unquestionably correct.

The old classification existing in New York city prior to the consolidation was superseded by the classification of March 5th, 1898, and thereupon ceased to have any force or effect whatever and has never been revived. The latter classification, consequently, still remains in full force and effect, unless it has been set aside by some competent authority. It will not aid the relator to say, as his counsel has attempted to show, that after the passage of chapter 186 of the Laws of 1898, no rules or regulations whatever concerning the civil service have been in force in New York city, since, in the absence of such rules, the authority that had the power to appoint the relator could also remove him. The power of appointment, in the absence of express statutory restrictions, includes the power of removal. What the relator needs is not a decision that all rules were abolished, but that some rule was in force on July 1 that put him into the competitive class.

The learned counsel for the relator has not attempted to show how his client, who was placed in the non-competitive class on the 5th of March, 1898, got into the competitive class on or before the first day of July following. His argument is entirely silent on that vital question. It is quite clear, I think, that this result was impossible, in view of the situation in this case, and all this can be shown by the aid of principles well established.

It is necessary in the first place to get a clear notion with respect to the nature of the act which the civil service commissioners of the city of New York, with the approval of the mayor, performed on the fifth of March, when they made the classification that took the relator out of the competitive class and placed him in the non-competitive class.

In the case of *Chittenden* v. *Wurster* (152 N. Y. 362) this court held that " Such a classification is not void; it may be voidable, for his action is subject to review; but, until it is judicially determined that his classification was erroneous, it is a protection to the subordinate heads of departments and employees acting thereunder. The appointments were made in accordance with the statute and the classification as it then

existed." This court was then dealing with the classification made by the mayor of Brooklyn, in which certain positions were omitted from the competitive schedule and placed in another schedule where competitive examinations were not necessary. That is precisely what was done in this case, and although it was contended in that case that the classification was repugnant to the provisions of the Constitution, yet the court held that it was good, and protected everybody until it was set aside. In that case it was also held that the remedy in such cases was to institute judicial proceedings to correct the classification. This is the language which the court used on that point, and which is correctly expressed in the head note to the case : " The people are not, however, without a remedy. There is one which is very simple and effective; if the mayor refuses to do his duty, or if he does it improperly, he may be compelled by direct proceeding, as by mandamus, or perhaps in some cases by certiorari, instituted by any resident citizen, to do it in accordance with the requirements of the Constitution and of the statute. The courts have the power to compel the discharge of such duties " by making the classification conform to the statute.

It is true that the doctrines of the case I have cited were combatted by a minority of the court, but they were approved by the majority, and, therefore, made the law of the land in the same sense as if all the members of the court concurred. The principles of that case became a rule of action for the guidance of the authorities of cities, the whole public and the legislature itself, and we must assume that they were accepted and acted upon. One of the most important of these rules was that a classification once made was good until set aside or modified by some judicial proceeding, and so long as it remained unchanged by the action of some judicial authority, it bound every one and protected every one acting under it or holding a place under it.

The classification which placed the relator in the non-competitive schedule has not been changed or set aside by any such proceeding; and the inquiry is how has it been affected

so as to take the relator out of the schedule in which he had
been placed and put him into another schedule where he was
not placed.  Obviously, if that has been done at all, it has
been done by the legislature in the enactment of chapter 186
of the Laws of 1898; but that statute cannot properly receive
any such construction.  In the first place, the classification of
March 5th having been made in pursuance of statutory author-
ity, and being reviewable by certiorari or enforceable by man-
damus, was a duty imposed upon the mayor and the civil
service commissioners judicial in character.  Of course, if it
was reviewable by certiorari it must have been a judicial act,
since an executive, legislative or ministerial act is not so review-
able.  The power of the legislature is restricted to the enact-
ment of laws, or, in other words, to powers that are legislative
in character.  It cannot set aside, annul or correct a judicial
act; and it had no more power to set aside this classification
than it had to set aside a judgment of the courts.  The act of
making the classification could be affected only by some
judicial proceeding; it could not be reviewed or corrected,
if erroneous, by the legislature.  The legislature has no power
to appoint or remove an officer or employee of a city.  A stat-
ute passed to turn out one class of officers and employees in a
city and to put some other class in is not a legitimate or con-
stitutional exercise of legislative power.  It is a usurpation of
the executive or judicial power.  A statute to annul or change
a judicial determination once made, whether by a court or some
other body in the performance of a duty authorized or required
by law and judicial in its nature, is open to the same objection.
The courts should always construe a statute as an exercise of
legislative power within the restrictions of the Constitution,
and not as an exercise of some other power which the legisla-
ture does not possess.  While the legislature had no power to
review or set aside a classification already made, it had the
power to provide in the future for a different method of classi-
fication.  That is to say, it had the power to provide that in the
future all classifications made should have the approval, not
only of the mayor of the city, but of the civil service commis-

sioners of the state. That is the power which it attempted to exercise. We should also always construe a statute to be prospective in its operation rather than retroactive. Hence, it is plain that the legislature must be deemed to be enacting a rule to take effect in the future and not to set aside or abrogate something that had been done by the municipal authorities previously under existing laws. The legislature had power to enact that *thereafter* classifications should be made upon certain principles and approved by certain state authorities, and then it becomes the duty of the civil service commissioners to make new rules or modify the old ones and submit them to the state civil service commissioners for approval ; but until they perform that duty, either voluntarily or by the direction of the courts, the classification of March 5th remained in full force, and, consequently, until that change was made, the relator remained in the non-competitive schedule. In the enactment of the statute in question the legislature exercised that power and nothing more. It certainly made no new classification, but devolved that duty upon the local authorities, and a new one was necessary in order to take the relator out of the non-competitive class and put him into the competitive class. The relator's appeal must fail unless he is able to show, what obviously cannot be shown, that the legislature had not only the power to abrogate and did abrogate the classification of March 5th, but actually made a new classification for itself, in which the relator was taken from the non-competitive list and put into the competitive list. The learned counsel for the relator will search in vain for either the power to thus annul an act held to be judicial in its nature, or for any language in the statute to show that the legislature had the slightest intention to do any of these things. The problem that faces the relator at every stage of the argument is to show how and when he got out of the non-competitive schedule and got into the competitive one, since, unless he was in the latter schedule when removed, his removal was clearly legal.

On a careful reading of the act of 1898, it will be seen that

the purpose which the legislature had in view was to require the local authorities to change the rules and not to annul an act which had already taken effect judicial in character. The statute provides that within two months after its passage it shall be the duty of each of the mayors of cities in and by regulations to cause to be arranged in classes the several clerks and persons employed or being in the public service of the cities. Now manifestly this was a legislative requirement that upon a designated day in the future the mayors of cities should classify the persons in the civil service in a particular manner, which was to be approved by a particular authority, which the existing law did not require. But, while it prescribed a new rule of action for the authorities in cities, it did not abrogate any rule which was then in force. If the mayors within the times designated did not proceed to enact the new rules, or to have the old ones modified and approved by the state civil service commissioners, they could be compelled to do so, but in the meantime the old classification existed and stood in full force.

It is too plain for argument, as it seems to me, that this statute could not and did not take the relator's position out of the non-competitive schedule, where it was placed by the classification of March 5th, and much less did it put the place in some other schedule.

The statute also contains this provision, which, perhaps, is the most important in the whole chapter: "Such regulations herein prescribed and established, and all regulations now existing for appointment and promotion in the civil service of said city and any subsequent modification thereof shall take effect only upon the approval of the mayor of the city and of the New York civil service commission." This language obviously refers to regulations "*herein prescribed*" and also to regulations "*now existing,*" and then provided that they "*shall take effect only,*" etc. This language cannot, by any fair construction, be deemed to annul a classification that had already taken effect. It speaks of something that *shall* take effect, and consequently did not refer to a thing that had

already gone into effect. It imposed a duty on the local authorities to modify the existing rules under which the various persons in the public service were classified, or to make new rules, and that neither the old rules as modified, or the new rules when made, should take effect until approved by the state civil service commission. The whole purpose of the statute was to set the local authorities again in motion, and require them to do their work over again by making another classification more satisfactory to the legislature. But in the meantime the civil service of the city was not remitted to chaos, since the rules and classifications of March 5th were in full force until superseded by the new or modified rules, which the legislature evidently thought to be necessary. The law avoids an interregnum in government in which no law is in force and society is reduced to anarchy, just as nature abhors a vacuum. So that, upon a careful reading of the statute, the conclusion is plain that the legislature were not seeking to annul or set aside any act, judicial or otherwise, that had already been performed and had gone into effect, but was providing for a new rule to be enacted by the local authorities to become operative in the future. The day within which it became their duty to act was fixed, and if the city authorities refused to comply with the new law, they could be compelled by judicial proceedings. This seems to me to be a more reasonable construction of the work of the legislature, than to hold that it was not engaged in legislation at all, properly speaking, but was seeking to set aside and annul a classification already made, under which the relator's legal status as an employee of the city was fixed. In a word, this statute, I repeat, did not take the relator's place out of the non-competitive schedule and place it in the competitive schedule; and it is necessary for him to establish that proposition in order to succeed upon this appeal. It may be added that his counsel has very wisely refrained from even the discussion of such a proposition. So I arrive at the conclusion that the decision of the court below was correct and ought to be affirmed.

BARTLETT, J. (dissenting).   The court having decided that chapter 186, Laws of 1898, which took effect March 31, 1898, and amended the Civil Service Law of 1883, applies to the city of New York, the rights of relator are to be considered in the light of that statute.   (*People ex rel. Leet* v. *Keller,* 157 N. Y. 90 ; *People ex rel. Fleming* v. *Dalton,* 158 N. Y. 175.)

In cases cited we held, construing the act of 1898, that, as the new civil service regulations for the city of New York took effect March 5th, 1898, and the act of 1898 did not become a law until March 31st, 1898, the act gave ninety days in which the regulations could be approved by the state civil service commission and that they were in force in the meantime.   In the case at bar we have a relator whose classification was changed from the competitive to the non-competitive list by these new regulations, but his removal did not take place until July 1st, 1898, when the time to obtain the approval of the state civil service commission had passed without securing it.

The act provides in its first section :  "Such regulations herein prescribed and established, *and all regulations now existing* for appointment and promotion in the civil service of said city and any subsequent modification thereof shall take effect only upon the approval of the mayor of the city and of the New York civil service commission."

Under this provision the civil service rules of the city of New York of March 5th, 1898, being "regulations now existing," could only survive the first day of July, 1898, by having the approval of the mayor and the state civil service commission.   I cannot agree with the suggestion in one of the prevailing opinions that it was only the existing regulations as modified that were to be approved.   Such a construction is not only contrary to the plain letter of the statute, but leads to the manifest absurdity that in the city of New York all that was necessary in order to defeat the act of 1898 and continue in full force and effect the city regulations of March 5th, 1898, was to do nothing — ignore the legislative command.

In my opinion there have been no civil service regulations in existence in the city of New York since July 1st, 1898, by reason of the failure to obtain the approval of the state civil service commission.

The result is that at the time the relator was removed the regulation that fixed his position as non-competitive had ceased to exist with the others of which it was a part.

It is this phase of the case that renders the principle laid down in *Chittenden* v. *Wurster* (152 N. Y. 345) wholly inapplicable, to the effect that an exempt classification is voidable, but not void until judicially declared erroneous.

The rules of classification in that case survived — were in full force and effect. In the case at bar the regulations and classifications thereunder had ceased to exist by legislative command.

In this situation the relator rested solely upon his constitutional rights.

The Constitution of this state provides (Art. V, § 9), among other things, that appointments and promotions in the civil service of the state, and of all the civil divisions thereof, including cities and villages, shall be made according to merit and fitness, to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive.

This court held (*People ex rel. McClelland* v. *Roberts*, 148 N. Y. at page 366), in construing these provisions of the Constitution, that if " the legislature should repeal all the statutes and regulations on the subject of appointments in the civil service the mandate of the Constitution would still remain, and would so far execute itself as to require the courts, in a proper case, to pronounce appointments made without compliance with its requirements illegal."

Invoking this principle and in view of the fact that the relator's position was unclassified after July 1st, 1898, the presumption would be, under these provisions of the Constitution, that he was entitled to a competitive examination. The presumption is in favor of the general policy of the Constitution rather than of its limitations and exceptions.

The relator filled a position on July 1st, 1898, subject to competitive examination, and for which he had been examined, and, consequently, he was entitled to have the reasons for his removal stated in writing and an opportunity afforded him to make an explanation under the act of 1898.

The order should be reversed, with costs.

GRAY and O'BRIEN, JJ., read for affirmance; PARKER, Ch. J., MARTIN and VANN, JJ., concur in result; HAIGHT, J., concurs in second ground stated in opinion of GRAY, J.; BARTLETT, J., files dissenting memorandum.

Order affirmed, with costs.